550 F.Supp. 869 (1982)
Russell JACKSON, et al., Plaintiffs,
v.
The PEOPLE'S REPUBLIC OF CHINA, a foreign government, Defendant.
No. 79-C-1272-E.
United States District Court, N.D. Alabama, E.D.
September 1, 1982.
*870 W. Eugene Rutledge, Birmingham, Ala., for plaintiffs.
No appearance entered for defendant.

MEMORANDUM OPINION
U. W. CLEMON, District Judge.
Plaintiffs, holders of certain bonds issued by the Imperial Chinese Government in 1911, brought this action against the People's Republic of China seeking payment of those bonds which are now in default. Plaintiffs filed suit pursuant to the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1391 and 1602 et seq. (hereinafter "Immunities Act"). This case is presently before the Court on motion of plaintiffs for default judgment pursuant to Rule 55, F.R.C.P.

Historical and Factual Background
With more than 4,000 years of recorded history, China is one of the oldest countries in the world. Its civilization flourished economically and culturally in the earliest stages of world civilization. Until modern times, China's development had been independent of other countries because of the spirit of its people as well as its geography.
Imperial China was born in 221 B.C. with the institution of the rule of the first emperor of the Ch'in Dynasty. During the rise and fall of the different Chinese dynasties China made great strides in agricultural productivity, cultural development and political unity. The political institutions of imperial China embodied a combination of Confucian Theory (characterized by respect for tradition, conventional social relationships and rule by benevolence) and Legalist practice (characterized by stern laws and severe punishments).
In the 16th century, during the Ming dynasty, drastic changes began to take place in China which would have far reaching effects on its insular nature. European explorers arrived in South China, followed by traders and missionaries. The importance of these events is that they heralded an end to China's isolation and the beginning of East-West contact.
China's preoccupation with tradition and its own cultural superiority made it reluctant to change in the face of western influence. However, its resistance was slowly dissipated, first by the acceptance of western technology. Its acceptance of and adoption of some western institutions was hastened by its defeat in the Sino-Japanese War (1894-1895) at the hands of an Asian country that had become more modernized than China. In the early 1900s, in a period known as the Manchu Reform Movement, China embraced modernization in earnest. One of the changes was the construction of a railway system in order to develop the economy, consolidate the defense system and strengthen national unification. The Hukuang Railway was a part of this expanding system.
*871 In 1911, the Imperial Chinese Government sold, issued for sale and authorized the issuance for sale in the United States certain bearer bonds, more particularly described as follows:
The Imperial Chinese Government 5% Hukuang Railways Sinking Fund Gold Loan of 1911, First of a Series for 6,000,000 Pounds Sterling, each bond denominated in either 20 or 100 Pounds Sterling. Bonds of £20 each Nos. 1 to 2500 and Bonds of £100 each Nos. 70,151 to 84,650 are countersigned by or on behalf of the Hongkong and Shanghai Banking Corporation, Bonds of £100 each Nos. 84,651 to 93,650 are countersigned by or on behalf of the Deutsch-Assiatische Bank, Bonds of £20 each Nos. 32,501 to 70,000 and Bonds of £100 each Nos. 93,651 to 101,150 are countersigned by or on behalf of the Banque de l'Indo-Chine and Bonds of £20 each Nos. 70,001 to 70,150 and Bonds of £100 each Nos. 101,151 to 116,120 are countersigned by or on behalf of Messrs. J.P. Morgan & Co., Messrs. Kuhn, Loeb & Co., The First National Bank of the City of New York, and the National City Bank of New York.
The proceeds from the sale of these bonds were used to build the final link in the north-south railway system. This link, the Hukuang Railway, connects Beijing, formerly Peking, and the port city of Canton. Prior to the completion of this railway, goods were transported either over land on poor roads or circuitously by the sea and the Yellow and Yangtze Rivers which run east-west. Consequently, the Hukuang Railway was a major step forward for fast and efficient transportation between north and south. It is still in operation as an integral part of China's railway system.
The 5% Hukuang Railway Bonds provide, among other things, that
The Bearer of this Bond is entitled to receive from the Imperial Government of China the principal sum of £100 Sterling (or, on £20 Bonds, £20 Sterling) on the 15th day of June 1951 with interest thereon until repayment at the rate of five percent per annum, payable half-yearly on the 15th day of December and the 15th day of June in each year in accordance with the coupons attached hereto....
The interest on this Bond will be payable on the surrender of the proper coupons hereto annexed. If redeemed the principal of this Bond with premium (if any) will be payable at or after the redemption date, on the surrender of this Bond with all coupons thereon not then due; if not redeemed, the principal will be payable at or after the due date on surrender of this Bond. All interest will cease on the principal becoming payable and provision having been made for its payment, whether the Bond shall be presented for payment or not. All payments of principal and interest on this Bond will be made in London in Sterling money of Great Britain at the office of the Hongkong and Shanghai Banking Corporation or (at the current rate of Sterling exchange of London on the day of presentation) in Berlin in Reichmarks at the office of the Deutsch-Asiatisch Bank, in Paris in Francs at the office of the Banque de l'Indo-Chine, and in New York in Dollars at the offices of Messrs. J.P. Morgan and Co., Messrs. Kuhn, Loeb & Co., The First National Bank of the City of New York and the National City Bank of New York, and such other offices in London, Germany, France and New York, respectively, as shall be notified by advertisement by the said respective Banks or Bankers. The Imperial Government of China pursuant to an Imperial Edict, dated the 20th May, 1911, hereby engages that the principal moneys and interest hereby secured shall duly be paid in full, and it further declares that this Bond and its Coupons and all payments made and received in connection therewith are exempt from all Chinese taxes and imports.
In 1912, shortly after the Hukuang bonds were issued, a revolutionary movement culminated in the replacement of the Imperial Chinese Government by the Republic of China. The government made timely interest payments on the Hukuang bonds until *872 December 15, 1930. After that date, only two other interest payments were made. These were half interest payments made on June 15, 1937 and June 15, 1938.
In the spring of 1937, the government of the Republic of China which was then led by Chiang Kai-shek, offered a compromise program to honor the Hukuang bonds. The government sought to extend the due date on the principal value of the bonds from June 15, 1951 until June 15, 1976. The compromise program was never assented to by the bondholders and was never carried out by the government because of the outbreak of the Sino-Japanese War in July, 1937.
The war with Japan continued until it announced its willingness to surrender in 1945. From that point until 1949, China was wracked with the turmoil of a civil war as the Communist Party of China fought to take control of mainland China. On August 13, 1947, the prime minister of the national government issued the following statement relative to the Hukuang bonds:
China pledges her honourable intention to repay those external loans the service of which was suspended in the course of the Sino-Japanese war. In no way does the conclusion of new loans in recent years prejudice the security of these pre-war loans or vitiate the rights of holders of such bonds. At the same time, China hopes soon to start a progressive programme of debt rehabilitation in accordance with the policy of upholding the national credit. Like so many other postwar nations today, China will yet need international economic assistance to rehabilitate her trade and industry so as to strengthen her ability to make debt payments. Nevertheless, the National Government is determined to do its best to fulfill its obligations and sincerely hopes that financial conditions will soon show sufficient improvement to enable it to make arrangements for an early resumption of the service of pre-war loans. (Plaintiffs' Exhibit 6).
The Communist party seized control of China in 1949 and established the People's Republic of China. The former national government withdrew to Taiwan.
It is an established principle of international law that "[c]hanges in the government or the internal policy of a state do not as a rule affect its position in international law. A monarchy may be transformed into a republic, or a republic into a monarchy; absolute principles may be substituted for constitutional, or the reverse; but, though the government changes, the nation remains, with rights and obligations unimpaired." Lehigh Valley R. Co. v. State of Russia, 21 F.2d 396, 401 (2d Cir.1927) (quoting Moore, Digest International Law, vol. 1, p. 249). The People's Republic of China is the successor government to the Imperial Chinese Government and, therefore, the successor to its obligations. The People's Republic of China has made no provision for payment of the principal due on the Hukuang bonds.

Jurisdiction
Under 28 U.S.C. § 1330(a), this Court has subject matter jurisdiction without regard to the amount in controversy over any nonjury civil action against a foreign state, agency or instrumentality as to any claim for relief with respect to which the foreign state or agency is not entitled to immunity. The People's Republic of China is a foreign state within the meaning of the Immunities Act and is not entitled to immunity from suit by virtue of 28 U.S.C. § 1605(a), which provides as follows:
(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case 
(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States....
*873 A "commercial activity carried on in the United States by a foreign state" is defined as a "commercial activity carried on by such state and having substantial contact with the United States." Id. § 1603(e). "A `commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to purpose." Id. 1603(d).
It is clear that the sale, issuance for sale and authorization of issuance for sale in the United States constitutes a "commercial activity" carried on in the United States by a foreign state. Sugarman v. Aeromexico, Inc., 626 F.2d 270 (3rd Cir.1980); Behring Intern. v. Imperial Iranian Air Force, 475 F.Supp. 383 (NJ 1979). Therefore, the defendant is not entitled to the general immunity granted to foreign states under 28 U.S.C. § 1604 with respect to the bonds which are the basis of this suit.
Having established subject matter jurisdiction, this Court may exercise jurisdiction over the defendant provided service of process is made in strict compliance with 28 U.S.C. § 1608. Service was made upon the People's Republic of China pursuant to 28 U.S.C. § 1608(a)(4) which states that
if service cannot be made within 30 days under paragraph (3) [(service by mail), service shall be made] by sending two copies of the summons and complaint and a notice of suit,[1] together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services  and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note[2] indicating when the papers were transmitted.
The Office of Special Consular Services sent to the Clerk of this Court a certified copy of the diplomatic note indicating that the summons, complaint and notice of suit were transmitted to the Embassy of the People's Republic of China in Washington, D.C. on May 16, 1980. Service is deemed to have been made as of the date of transmittal. Therefore, service of process was made on the People's Republic of China even though its embassy returned all of the documents to the Director of Special Consular Services approximately one month later.

Class Action
On October 22, 1981, this Court certified this action as a class action consisting of all persons who, on the date of the order, were holders of the Hukuang Railway bonds which are the basis of this suit. On the same date, the Court found that the People's Republic of China had failed to appear or to answer plaintiffs' complaint within the time allowed by law and that the time for answering or appearing had expired. Accordingly, a default was entered against the defendant and in favor of the plaintiff class.
The Court ordered plaintiffs' lead counsel, W. Eugene Rutledge, to mail an approved notice to all known class members and to specified brokerage houses and to publish said notice in the Wall Street Journal and Barrons. Copies of the orders certifying this as a class action and entering a default were served upon the Embassy of the People's Republic of China in the same manner as the summons, complaint and notice *874 of suit were served. The Embassy returned these documents to the United States Department of State.

Default Judgment
Section 1608(e) provides that no default judgment shall be entered against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." This is the same rule that applies to entry of default judgments against the United States. F.R.C.P. 55(e). By its order of October 22, 1981, this Court, on the basis of plaintiffs' motion, brief and testimony, found that the People's Republic of China failed to appear or plead within the requisite time and was, therefore, in default. The defendant received notice of this order by "notice of entry of default" on December 10, 1981. At the same time, the defendants were advised that they had sixty days after receipt of the documents within which to ask the Court to set the default aside. Rule 55(c), F.R.C.P., does not set a specific time for setting aside a default. However, courts have held that the moving party must act with reasonable promptness. See, e.g., Consolidated Masonry & Fireproofing, Inc. v. Wagman Construction Corp., 383 F.2d 249 (4th Cir.1967) (two and one-half months was not reasonably prompt). Not only has the People's Republic of China refused to avail itself of the legal procedures available to set aside entry of default, it has returned all documents sent to it and has indicated that it will not be a party to this suit. Under the circumstances, the plaintiff class is entitled to and this Court has the authority to enter a judgment of default against the People's Republic of China.
In light of the preceding discussions, it is clear that plaintiffs are entitled to payment of all unpaid interest and principal on the Hukuang bonds. The only issue remaining then is the determination of plaintiffs' damages.

Damages
A hearing was held before this Court on March 29, 1982, to determine the amount of damages. Expert testimony was presented to the Court concerning the method by which calculations should be made to determine the amounts due in unpaid principal and interest. A calculation table prepared by the expert witness who testified at the hearing of this case is attached to this Memorandum Opinion as Exhibit A. These calculations were made as follows: The exchange rate from British Pounds to United States Dollars was ascertained,[3] using figures provided by the United States Federal Reserve Bank, for each date on which an interest payment or coupon was due. Interest earned on each coupon payment after its due date is then calculated at 5% simple interest. The principal amount due June 15, 1951, is converted at the then applicable exchange rate of 2.80626 Dollars per Pound Sterling to equal a principal payment due on that date of $280.63. Addition of all coupon payments so calculated plus the final payment of principal yields a sum of $1,009.58 due for each 100 Pound bond on June 15, 1951. Simple interest at 5% annually is then calculated on this amount of $1,009.58 beginning after June 15, 1951, up through the date of the hearing before this Court on March 29, 1982, to arrive at a total figure of $4,617.22 for each 100 Pound bond. Each 20 Pound bond is worth one-fifth of that value, or, $923.44.
On the basis of the foregoing, a default judgment will be entered in favor of plaintiffs in an amount representing $4,617.22 for each 100 Pound bond properly claimed in this action and $923.44 for each 20 Pound bond properly claimed in this action. A separate order embodying these conclusions shall issue.

*875
 EXHIBIT A
 Cumulated Unpaid Interest and Principal Due on
 Hukuang Railway 5% £ 100 Gold Bond 
 Dollar Value of Interest Earned Total
 Date British Sterling During Past Six Dollars Due
 Payment Due Months at Five But Unpaid
 (Interest: 2 ½) Percent Yearly
 £ 1 =
December 15, 1930 $4.86 $12.15 ____ $12.15
June 15, 1931 4.86 12.15 .30 24.60
December 15, 1931 3.43 8.58 .62 33.80
June 15, 1932 3.67 9.18 .85 43.83
December 15, 1932 3.29 8.23 1.10 53.16
June 15, 1933 4.09 10.23 1.33 64.72
December 15, 1933 5.09 12.73 1.62 79.07
June 15, 1934 5.05 12.63 1.98 93.68
December 15, 1934 4.94 12.35 2.34 108.37
June 15, 1935 4.94 12.35 2.71 123.43
December 15, 1935 4.93 12.33 3.09 138.85
June 15, 1936 5.03 12.58 3.47 154.90
December 15, 1936 4.91 12.28 3.87 171.05
June 15, 1937 (4.94) Paid. 4.28 175.33
December 15, 1937 5.00 12.50 4.38 192.21
June 15, 1938 (4.97) Paid. 4.81 197.02
December 15, 1938 4.67 11.68 4.93 213.63
June 15, 1939 4.68 11.70 5.34 230.67
December 15, 1939 3.95 9.88 5.77 246.32
June 15, 1940 3.69 9.23 6.16 261.71
December 15, 1940 4.04 10.10 6.54 278.35
June 15, 1941 4.03 10.08 6.96 295.39
December 15, 1941 4.04 10.10 7.38 312.87
June 15, 1942 4.04 10.10 7.82 330.79
December 15, 1942 4.04 10.10 8.27 349.16
June 15, 1943 4.04 10.10 8.73 367.99
December 15, 1943 4.04 10.10 9.20 387.29
June 15, 1944 4.04 10.10 9.68 407.07
December 15, 1944 4.04 10.10 10.18 427.35
June 15, 1945 4.04 10.10 10.68 448.13
December 15, 1945 4.03 10.08 11.20 469.41
June 15, 1946 4.03 10.08 11.74 491.23
December 15, 1946 4.03 10.08 12.28 513.59
June 15, 1947 4.03 10.08 12.84 536.51
December 15, 1947 4.03 10.08 13.41 560.00
June 15, 1948 4.03 10.08 14.00 584.08
December 15, 1948 4.03 10.08 14.60 608.76
June 15, 1949 4.03 10.08 15.22 634.06
December 15, 1949 2.80 7.00 15.85 656.91
June 15, 1950 2.80 7.00 16.42 680.33
December 15, 1950 2.80 7.00 17.01 704.34
June 15, 1951 2.80625 7.00 17.61 728.95
 £ 100 at 2.80625 = 280.63 1,009.58

*876
 Cumulated Unpaid Interest and Principal Due on
 Hukuang Railway 5% £ 100 Gold Bond (Continued)
 Date Interest Earned During Total Dollars
 Past Six Months at Five Due But Unpaid
 Percent Yearly
December 15, 1951 25.24 1,034.82
June 15, 1952 25.87 1,060.69
December 15, 1952 26.52 1,087.21
June 15, 1953 27.18 1,114.39
December 15, 1953 27.86 1,142.25
June 15, 1954 28.56 1,170.81
December 15, 1954 29.27 1,200.08
June 15, 1955 30.00 1,230.08
December 15, 1955 30.75 1,260.83
June 15, 1956 31.52 1,292.35
December 15, 1956 32.31 1,324.66
June 15, 1957 33.12 1,357.78
December 15, 1957 33.94 1,391.72
June 15, 1958 34.79 1,426.51
December 15, 1958 35.66 1,462.17
June 15, 1959 36.55 1,498.72
December 15, 1959 37.47 1,536.19
June 15, 1960 38.40 1,574.59
December 15, 1960 39.36 1,613.95
June 15, 1961 40.35 1,654.30
December 15, 1961 41.36 1,695.66
June 15, 1962 42.39 1,738.05
December 15, 1962 43.45 1,781.50
June 15, 1963 44.54 1,826.04
December 15, 1963 45.65 1,871.69
June 15, 1964 46.75 1,918.44
December 15, 1964 47.96 1,966.40
June 15, 1965 49.16 2,015.56
December 15, 1965 50.39 2,065.95
June 15, 1966 51.64 2,117.59
December 15, 1966 52.94 2,170.53
June 15, 1967 54.26 2,224.79
December 15, 1967 55.62 2,280.41
June 15, 1968 57.01 2,337.42
December 15, 1968 58.44 2,395.86
June 15, 1969 59.90 2,455.76
December 15, 1969 61.39 2,517.15
June 15, 1970 62.93 2,580.08
December 15, 1970 64.50 2,644.58
June 15, 1971 66.11 2,710.69
December 15, 1971 67.77 2,778.46
June 15, 1972 69.46 2,847.92
December 15, 1972 71.20 2,919.12
June 15, 1973 72.98 2,992.10
December 15, 1973 74.80 3,066.90
June 15, 1974 76.67 3,143.57
December 15, 1974 78.59 3,222.16
June 15, 1975 80.55 3,302.71
December 15, 1975 82.57 3,384.28
June 15, 1976 84.63 3,468.91
December 15, 1976 86.72 3,555.63
June 15, 1977 88.89 3,644.52
December 15, 1977 91.11 3,735.63
June 15, 1978 93.39 3,829.02
December 15, 1978 95.73 3,924.75

*877
 Cumulated Unpaid Interest and Principal Due on
 Kukuang Railway 5% & 100 Gold Bond (Continued)
Date Interest Earned During Total Dollars
 Past Six Months at Five Due But Unpaid
 Percent Yearly
June 15, 1979 98.12 4,022.87
December 15, 1979 100.57 4,123.44
June 15, 1980 103.09 4,226.53
December 15, 1980 105.66 4,332.19
June 15, 1981 108.30 4,440.49
December 15, 1981 111.01 4,551.50
October 22, 1981 $4,520.02
March 29, 1982 $4,617.22

JUDGMENT
Defendant, The People's Republic of China, has defaulted in this action. Its default was entered on October 22, 1981. The issue of the amount of damages sustained by the plaintiff class was submitted to the Court and the Court determined that plaintiffs suffered damages in the amount of Forty-One Million, Three-Hundred Thirteen Thousand, Thirty-Eight Dollars and 00/100 Cents ($41,313,038.00).
Pursuant to and in accordance with the Memorandum Opinion entered contemporaneously herewith, it is, therefore,
ORDERED, ADJUDGED and DECREED that plaintiffs recover the sum of $41,313,038.00 with interest thereon at the legal rate from and after the 1st day of September, 1982, together with costs of this action.
NOTES
[1] A "notice of suit" is described fully at 22 C.F.R. § 93.2 (1981). The same section applies to notice of a default judgment.
[2] A diplomatic note of transmittal must accompany documents delivered under 22 C.F.R. § 93.1(c). The note, which is prepared by the Office of Special Consular Services, merely requests that the documents be forwarded to the foreign state's appropriate authority. It also informs the foreign state that questions of jurisdiction and immunity must be addressed to the court and not to the Department of State and advises that an attorney in the United States be consulted.
[3] The bonds specify that payment of interest and principal is to be made in British Pounds Sterling.