**ASOCIACIAN DE RECLAMANTES, et al., Plaintiffs,**

v.

**The UNITED MEXICAN STATES, Defendant.**

**Civ. A. No. 81–2299.**

United States District Court, District of Columbia, Civil Division.

April 20, 1983.

Baron, Faulkner & Salazar, P.C., Robert J. Salazar, Denver, Colo., Russell E. Vigil, Englewood, Colo., Jess J. Araujo, Santa Ana, Cal., Rogovin, Huge & Lenzner, A Professional Corp., Mitchell Rogovin, George T. Frampton, Jr., Vicki C. Jackson, Susan L. Carney, Washington, D.C., for plaintiffs.

Milbank, Tweed, Hadley & McCloy, John H. Shenefield, Glenn S. Gerstell, Peter E. Halle, Eric L. Richard, Dorothy A. Doherty, D. Stephen Mathias, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

THOMAS F. HOGAN, District Judge.

### I. *Introduction*

This case is before the Court on a motion to dismiss. It involves a class action brought by the Asociacion de Reclamantes and six individual plaintiffs seeking compensation from the United Mexican States ("Mexico") for its alleged taking and conversion of certain land grant related claims possessed by plaintiffs or their ancestors.

Mexico asserts that the Court lacks subject matter jurisdiction to hear this case as well as personal jurisdiction over Mexico, and that even if the Court assumes jurisdiction, the act of state doctrine precludes it from exercising its jurisdiction and resolving the controversy between the parties.

Counsel filed excellent briefs in this case and their arguments before the Court on January 16, 1983 were exceedingly helpful in weighing the multitude of contested and competing issues. As the Court noted at the hearing in this case, the alleged injuries to plaintiffs are not only serious and entitled to careful review, but give the Court great concern. Mindful of those considerations, and in accordance with the opinion which follows, the Court holds that it is without subject matter jurisdiction and that the case must be dismissed.

### II. *Facts*

In evaluating a motion to dismiss for lack of subject matter jurisdiction under

Fed.R.Civ.P. 12(b)(1), the Court must accept as true all material facts alleged in the complaint. *Williamson v. Tucker,* 645 F.2d 404, 412–13 (5th Cir.1981) (on rehearing); *Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 511 (5th Cir.1980), *cert. denied,* 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980); *Mortensen v. First Federal Savings & Loan Ass'n,* 549 F.2d 884, 891–92 (3d Cir.1977); *Airline Pilots Ass'n Int'l v. Northwest Airlines, Inc.,* 444 F.Supp. 1138, 1142 (D.D.C. 1978). Only where the defendant raises a factual challenge to the jurisdictional facts in the complaint need the court look beyond plaintiff's allegations. *Id.* Here, the defendant has not challenged plaintiff's jurisdictional facts, but rather asserts that on their face, they fail to invoke the power of this Court.

■ Likewise, in evaluating defendant's motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), the Court must also accept as true all material facts alleged in the complaint. *Mortensen v. First Federal Savings & Loan Ass'n,* 549 F.2d at 891.

Plaintiffs' claims stem, in part, from the upheaval caused by the Mexican-American War. At the cessation of hostilities, sovereignty over Texas was transferred from Mexico to the United States under the Treaty of Guadalupe Hidalgo, 9 Stat. 922, T.S. No. 207 (Feb. 2, 1848). In the years which followed, plaintiffs' ancestors, who owned land in Texas,[1] were allegedly driven off their land or wrongfully divested of title by the United States, Texas, or the citizens thereof. These actions occurred in spite of provisions in the 1848 Treaty providing that the former Mexican landowners' land grants were entitled to the protection and respect of the United States. Art. VIII, Treaty of Guadalupe Hidalgo, *supra.*

No allegation is made that plaintiffs' ancestors sought the return of, or compensation for, their land in a United States forum since 1848. Rather, plaintiffs' ancestors, many of whom returned to Mexico, convinced the Mexican Government to pursue their claims through diplomatic channels in the early 1920s. Under a 1923 General Claims Treaty between the United States and Mexico, 43 Stat. 1730, T.S. No. 678 (Sept. 8, 1923), the nations created a General Claims Commission to resolve all claims by citizens of each nation against the other contracting nation. The Commission was directed to quantify the number and size of the claims, and to the extent the aggregate claims of the citizens of either nation exceeded the other nation's aggregate claims, the difference would be repaid sovereign to sovereign.[2] Each sovereign would then be responsible for providing compensation to its own citizens.[3] By 1940, only a few of the 433 claims submitted by Mexico on behalf of plaintiffs are alleged to have been evaluated.

Fueled by the expropriation of American oil company properties in Mexico in 1938, the two sovereigns went to the bargaining table again in 1940. These negotiations allegedly included the 433 land grant claims at issue in this case, and resulted in the payment of $40 million by Mexico to the United States, an amount by which it was found the aggregate United States claims exceeded the aggregate Mexican claims. Treaty on Final Settlement of Certain Claims, 56 Stat. 1347, T.S. No. 980 (Nov. 19, 1941). Plaintiffs further allege that the total value received by Mexico (i.e., total claims against Mexico released) was in excess of $193 million, and that:

> Mexico's release of the United States from liability on the 433 land grant related claims, in exchange for valuable consideration, constituted a use and taking

1. The land in question involves 433 land grants from Spain and Mexico to the ancestors of plaintiffs and consists of approximately 12 million acres of land lying principally between the Rio Grande and the Nuces River in South Texas.

2. United States citizens also had claims of expropriation or wrongful taking of property against Mexico and its citizens, in large part as a result of the Mexican Revolution.

3. In 1934 the General Claims Commission was replaced by two special claims appraisers using a revised appraisal process.

by Mexico of those claims for its own public purposes, including the reduction of Mexico's financial liabilities to the United States. As a result, Mexico became obligated to pay just, effective and prompt compensation for the 433 land grant related claims.

Complaint par. 29.

Shortly after the treaty was signed, the then President of Mexico issued a decree acknowledging Mexico's assumption of the obligation for the land grant related claims, which, in part, stated:

FOREIGN AFFAIRS DEPARTMENT, DECREE BY WHICH IT IS ORDERED THAT A LAW BE ENACTED FOR THE SETTLEMENT, VALUATION, AND PAYMENT OF THE CLAIMS PENDING BETWEEN MEXICO AND THE UNITED STATES OF AMERICA.

Whereas the Convention regarding claims, signed on the 19th of November of the current year, by the Governments of Mexico and the United States of America, annuls all of the Mexican Claims filed before the General Claims Commission. . . .

Whereas it is the duty of the Government to tend to said claims of our nationals in order to satisy them in accordance with the role played in the recently executed convention with our neighbor country to the north and in accordance with rules of equity . . . .

Whereas the claims referred to have lost their international character, and have become internal obligations of our government . . . .

Whereas it is necessary to have a law enacted by the honorable Congress of the Union indicating the appropriate procedure for evaluating the claims referred to in this Decree, to judge them and to ascribe to them the compensation to which they are entitled, honoring the findings dictated by the international jurisdictions that have decided some of them . . . .

### Decree

I. The Secretariat of Finance shall immediately proceed to study and prepare a plan, which shall be submitted to the honorable Congress of the Union, involving a law for the settlement, valuation, and payment of the Mexican claims presented to the extinct General Claims Commission, established by virtue of the agreement between Mexico and the United States of America on September 8, 1923 . . . .

129 D.O. Sec. 5 at 1–2 (Dec. 31, 1941) (original and translation submitted as Plaintiffs' Exh. E). Thereafter, the Secretariat of Public Finance and Credit acting through the Department of Public Debt of the Administration of Credit sent several letters to plaintiffs assuring them a law would be enacted and compensation paid. Plaintiffs' Exhibits F, G & H. In addition, plaintiffs repeatedly met with Mexican officials to discuss payment of compensation and allegedly were assured that payment was forthcoming.

On September 18, 1981, plaintiffs filed their initial class action in this case, and pursuant to an order of this Court filed a First Amended Complaint on December 18, 1981. On June 17, 1982, discovery was stayed pending a ruling on Mexico's motion to dismiss filed on February 2, 1982. As of this point in time, the plaintiffs assert that no legislation providing for compensation has been enacted in Mexico and Mexico appears to agree. Mexico attached a declaration of its Attorney General stating that: (1) he is authorized to issue official declarations in the name of the Mexican government; (2) he has examined the Complaint in this case; and (3) "that all acts and failures to act by officials or employees of the United Mexican States . . . are a part of the official functions and would be official acts of the Mexican State carried out on its behalf and in the exercise of its sovereign immunity." Official Declaration of the Attorney General, Republic of Mexico (Jan. 29, 1982) (original and translation attached as Exhibit A to Defendant's Memorandum in Support of its motion to dismiss).

III. *Discussion*

Mexico asserts three principal grounds in support of its motion to dismiss: (1) lack of subject matter jurisdiction; (2) lack of personal jurisdiction; and (3) failure to state a claim.[4] The question of personal jurisdiction is subsumed, however, by the first ground under the Foreign Sovereign Immunities Act ("FSIA").[5]

A. *Subject Matter Jurisdiction*

■ Plaintiffs allege subject matter jurisdiction under 28 U.S.C. Sec. 1330(a) and 28 U.S.C. Sec. 1331. Defendant responds that 28 U.S.C. 1330(a) is the exclusive statutory grant of jurisdiction, and that pursuant to its provisions, Mexico is immune as a sovereign from the power of this Court. The Court finds that the question of jurisdiction under 28 U.S.C. Sec. 1331 is a non-issue. For if Mexico is immune under the FSIA, it is, as plaintiff concedes, "of no consequence whether Sec. 1331 jurisdiction exists as well."[6]

The existence of subject matter jurisdiction turns on whether Mexico's acts or omissions fall within the general rule of immunity, 28 U.S.C. Sec. 1604, or are excepted from jurisdiction immunity under 28 U.S.C. Sec. 1605(a)(4) or (5). The plain language of the FSIA provides:

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

28 U.S.C. Sec. 1604. Plaintiffs do not rely on an "existing international agreement" but solely on the above cited exceptions in Sec. 1605. In evaluating plaintiffs' assertions, the Court must respect the Congressional directive that claims of sovereign immunity "henceforth be decided by courts" in accordance with the FSIA, and not by deference to political and diplomatic channels. 28 U.S.C. Sec. 1602.[7]

The House Report explains:

... the bill would codify the so-called "restrictive" principle of sovereign immunity, as presently recognized in international law. Under this principle, the immunity of a foreign state is "restricted" to suits involving a foreign state's public acts (*jure imperii*) and does not extend to suits based on its commercial or private acts (*jure gestionis*). This principle was

---

4. Mexico also raises the statute of limitations as a defense, however, the Court does not reach that issue due to the lack of subject matter jurisdiction over the defendant.

5. 28 U.S.C. Sec. 1330(b) provides that:

Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject matter] jurisdiction under subsection (a) where service has been made under section 1608 of this title ...

A joint motion and stipulation agreeing that service was proper was filed on December 4, 1981 and accepted by the Court on December 15, 1981. Therefore, all that remains to be decided is whether there is (a) subject matter jurisdiction, *id.,* and (b) a justiciable claim under the FSIA. 28 U.S.C. Sec. 1330(c). *See In the Matter of the Arbitration Between Maritime International Nominees Establishment v. Republic of Guinea,* 693 F.2d 1094, 1099–1100 (D.C.Cir.1982).

6. Plaintiff's Memorandum in Opposition to the Motion to Dismiss the Complaint, at 4 n. 5 (April 5, 1982). The Court notes that the great-

er weight of authority suggests that Sec. 1330 is the exclusive means for exercising jurisdiction over a foreign sovereign. It was enacted as part of the FSIA "to provide when and how parties can maintain a lawsuit against a foreign state ..." and to ensure parties have a federal forum without needing to invoke diversity jurisdiction. H.Rep. No. 94–1487, 94th Cong., 2d Sess. 61, 13 (1976), U.S.Code Cong. & Admin. News 1976, p. 6604. *See Maritime Int'l Nominees v. Republic of Guinea, supra,* 693 F.2d at 1099; *Ruggiero v. Compania Puruana de Vapores, S.A.,* 639 F.2d 872, 875 (2d Cir.1981).

7. The Congress became dissatisfied with the State Department practice of making formal suggestions of sovereign immunity in suits against foreign sovereigns. They often resulted in inconsistent decisions due to unequal abilities on the part of foreign sovereigns to bring diplomatic influences to bear on the State Department—influences which could deny litigants due process and may not have been relevant to the decision. H.Rep. No. 94–1487, *supra,* at 7.

adopted by the Department of State in 1952 and has been followed by the courts and by the executive branch ever since. Moreover, it is regularly applied against the United States in suits against the U.S. Government in foreign courts.

H.Rep. No. 94–1487, *supra,* at 7, U.S.Code Cong. & Admin.News 1976 p. 6605. The parties' dispute involves, and jurisdiction turns on whether Mexico's expropriation of, and continuing failure to pay, plaintiffs' claims are *jure imperii* or *jure gestionis.*

At first blush, it appears that Mexico's acts or omissions are public acts. Mexico officially traded plaintiffs' claims in international negotiations with the United States and by treaty and executive decree, assumed and acknowledged its responsibility to plaintiffs to compensate them for their claims. As recently as January 29, 1982, the Attorney General of Mexico acknowledged the claims. The claims, however, could not be for title, but for compensation for the wrongful taking of title in the 19th Century.[8] When the claims were before the General Claims Commission, the United States was in a position to consider offering land as compensation, but such a result was neither likely nor obligatory; particularly where the 1923 treaty recognized that the claims of each nation's citizens, resulting from a variety of unrelated circumstances, were to be set off against

one another and resolved on the diplomatic level—allowing each nation to deal with its citizens directly.

The Court finds that plaintiffs' claims, at least since 1923, while they may have their genesis in a wrongful taking of property, were no more than just that: claims. The Court further finds, as both parties concede, that by virtue of the 1923 and 1941 treaties, the claims became internal obligations of Mexico. While Mexico's decision to assume responsibility for plaintiffs' claims may amount to an expropriation, it is by no means clear that the plaintiffs had any rights whatsoever against the United States once their remedies to quiet title expired. Before Mexico can provide a remedy, it must first evaluate and raise money to cover the claims. This is by no means a ministerial task, and requires, at a minimum, public action by the Mexican Government.

Plaintiffs respond, however, that the FSIA recognizes that satisfaction of every claim, whether it be commercial or tort, requires a public act, and that 28 U.S.C. Sec. 1605 was enacted to codify the "restrictive" principle of sovereign immunity and guide the courts in applying the doctrine.[9] Accordingly, the Court finds it necessary to evaluate plaintiffs' assertion of exceptions (4) and (5) of Section 1605(a).[10]

---

**8.** There is no allegation by plaintiffs that they or their ancestors sought to retain or quiet title within the applicable statute of limitations after the alleged wrongful takings occurred. Moreover, Mexico has no power over title to land within the United States under the 1941 treaty.

**9.** *Compare Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes,* 336 F.2d 354 (2d Cir.1964) (sovereign held immune prior to enactment of FSIA in connection with a commercial loan obtained for general governmental purpose), *cert. denied,* 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965).

**10.** The Court notes that there is a question whether Mexico's "internal obligation" can fall within any of the exceptions to section 1605.

In a section-by-section analysis prepared by the Departments of State and Justice in 1973, the view was expressed that:

Public debts do not fall within the scope of 1605. The immunity of foreign states in this respect should be maintained by the United

States, in its role as one of the principal capital markets of the world . . . .

Immunities of Foreign States: Hearings on H.R. 3493, Before the Subcomm. on Claims and Government Relations of the H. Comm. on the Judiciary, 93d Cong., 1st Sess. 42 (1973) (hereinafter "1973 Hearings"). The Court is mindful of Congress' instructions not to consult the 1973 section by section analysis in construing the FSIA and that no inferences should be drawn by differences between the 1973 analysis and the FSIA. H.Rep. No. 94–1487, *supra,* at 12. For this reason, the Court is not relying on any "differences," but instead notes the following contemporaneous constructions of the bill.

When the FSIA was first proposed it contained proposed Section 1606 which provided that all debts of sovereigns would remain beyond the jurisdiction of the U.S. courts. *See* H.R. 11315, 93d Cong., 1st Sess. (1973); H.R. 11315, 94th Cong., 1st Sess. (1975); 1973 Hearings, *supra,* at 42. Ultimately, the provision

### 1. The Immovable Property Exception— Sec. 1605(a)(4)

Under 28 U.S.C. Sec. 1605(a):

A foreign state shall not be immune from the jurisdiction of courts of the United States ... in any case—(4) in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue....

Notably, this exception to the general rule of sovereign immunity contains two independent triggering clauses. The first clause speaks of "rights in property in the United States acquired by succession or gift" and the second speaks of "rights in immovable property situated in the United States." Plaintiffs make a formalistic argument that the first phrase was drafted to deal with all kinds of property (real, personal or intangible) acquired by succession or gift and that the second phrase was drafted to deal with suits involving rights in immovable property. Plaintiffs assert that both clauses apply to its claims against Mexico. They argue alternatively that their claims arise from rights in "immovable property," as well as concern inherited intangible property (i.e., claims) located in the United States. The Court disagrees.

Since the beginnings of positive law, attorneys have argued over the plain meaning of statutes. See Graff, "Keep Off the Grass," "Drop Dead," and Other Indeterminacies: A Response to Sanford Levinson, 60 Tex.L.Rev. 405 (1982). Plaintiffs first seek to establish that their claims are a "usufructuary" interest [11] and thus a right in "immovable property." The difficulty with this assertion is it assumes plaintiffs had a colorable legal right to title in 1923 when Mexico and the United States agreed to consider their claims at the diplomatic level. When sovereigns sit down at the bargaining table, as Mexico and the United States did in 1923, 1934 and 1941, a multitude of considerations may effect a decision to recognize a claim, considerations which may not be cognizable at law. Plaintiffs have not alleged that they had title to the land in 1923 or that they attempted to regain title in a legal forum prior to that time. All they have alleged is the United States' acknowledgment, at the diplomatic level, of plaintiffs' rights to prove their claims, and that Mexico assumed the United States' obligation to satisfy the claims. As a result, it requires a stretch of the Court's imagination to hold that the underlying controversy in this suit involves an action to quiet title or to recover money derivative of real property rights. See Bachman v. Lawson, 109 U.S. 659, 3 S.Ct. 479, 27 L.Ed. 1067 (1884); Comegys, et al. v. Vasse, 26 U.S. (1

---

was deleted from H.R. 11315. The Committee found it unnecessary because U.S. lenders "invariably include an express waiver of immunity in the debt instrument." H.Rep. No. 94–1487, supra, at 10; S.Rep. No. 1310, 94th Cong., 2d Sess. 7 (1976), U.S.Code Cong. & Admin.News 1976, p. 6609. Proposed section 1606 was ambiguous in that it applied to all debts, not just general governmental obligations. The State Department considered amending it but then decided that no provision was better than a more precise provision which identified only non-commercial debts for general government obligations as eligible for per se sovereign immunity. Jurisdiction of the U.S. Courts in Suits Against Foreign States: Hearings on H.R. 11315 Before the Subcomm. on Administrative Law and Government Relations of the H.Comm. on the Judiciary, 94th Cong., 2d Sess. 69, 75 (1976).

The 1976 House Report specifically discusses the deletion of proposed section 1606 to which the above quoted passage referred. The Committee appears to have ignored the fact that a public debt could exist in other than the commercial lending context. It merely suggests that only public debts "which are of a commercial nature and should be treated like other commercial transactions" are excepted from sovereign immunity. Id. The non-commercial debt obligation is thus arguably immune by implication and may place the "internal obligations" in dispute in this case outside the scope of the Section 1605 exceptions.

This is in accordance with the historical meaning of a "public debt," which was considered a per se public act and a sufficient basis for sovereign immunity. See, e.g., Letter from Jack B. Tate, Acting Legal Advisor, U.S. Dept. of State, to the Attorney General (May 19, 1952), reprinted in Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 711–15, 96 S.Ct. 1854, 1869–71, 48 L.Ed.2d 301 (1976).

11. See La.Civ.Code Ann. Arts. 462–470, 575 (West 1980); Mexican Civ.Code Arts. 750, 980 (Ediciones Andrade 1976).

Pet.) 193, 7 L.Ed. 108 (1828). Rather, the Court holds that plaintiffs' claims, however meritorious they appear on the scales of justice, involve intangible property rights created through the diplomatic process. *Cf. Matter of Rio Grande Transport,* 516 F.Supp. 1155, 1160 (S.D.N.Y.1981) (a liability compensation fund is not real estate and thus not immovable property).

Plaintiffs alternatively argue that their claims fall within the meaning of inherited property under section 1605(a)(4). This assertion must also fail. If the Court were to adopt plaintiffs expansive reading of the FSIA, any claim or chose in action involving inherited property (real, personal or intangible) would be excepted from the rule of sovereign immunity. Because every dispute with a foreign sovereign necessarily involves these kinds of intangible rights, every dispute in plaintiffs' view would be excepted from sovereign immunity when it passes by gift or succession. This is contrary to the purpose of the FSIA.

The FSIA codified the existing "restrictive" principles of sovereign immunity in section 1605. H.Rep. No. 94–1487, *supra,* at 7. Congress included the succession clause ("rights in property in the United States acquired by succession or gift") to ensure that real, personal and intangible property rights were justiciable where a foreign sovereign steps into the shoes of a private litigant by obtaining rights in property through a gift or inheritance. H.Rep. No. 94–1487, *supra,* at 20. *See generally* Restatement (Second) of the Foreign Relations Law of the United States (Revised) sec. 455 (Tent. Draft No. 2, 1981). It did not intend to open the courts to all suits involving inherited or donated property.

### 2. *The Tort Exception—28 U.S.C. Sec. 1605(a)(5)*

Plaintiffs next rely on the tort exception to invoke the jurisdiction of the Court. They reason that Mexico assumed a duty to compensate plaintiffs in the United States when it signed the 1941 treaty, and that the continuing failure to provide such compensation amounts to a conversion of plaintiffs' claims.

Section 1605(a)(5) provides for limited jurisdiction over tort claims:

A foreign state shall not be immune from the jurisdiction of the courts of the United States ... in any case ... in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused . . . .

28 U.S.C. sec. 1605(a)(5). As noted above, plaintiffs do not assert, nor is it clear that they possessed, legal claims against the United States. They argue instead that whatever the status of their claims against the United States, Mexico acknowledged their validity, assumed responsibility, and converted their rights.

The settlement of claims between sovereigns, in which each sovereign agrees to compensate its own citizens, does not create a private right of action in U.S. courts for a taking or conversion resulting from the failure of the United States to provide the agreed upon compensation. *Aris Gloves, Inc. v. United States,* 420 F.2d 1386, 190 Ct.Cl. 367 (Ct.Cl.1970). *See* Restatement (Second) of the Foreign Relations Law of the United States (Revised) sec. 721 n. 8 (Tent. Draft No. 3, 1982); L. Henkin, *Foreign Affairs and the Constitution* 262–63 (1972). The rationale for this rule applies with greater force in this case where the Court is asked to intervene in a foreign sovereign's relations with plaintiffs under a treaty. Not only does it require a review of the actions of the Mexican Government, but it requires an implicit reversal of the decision by the Executive Branch and Congress to entrust the com-

pensation of plaintiffs to Mexico in 1941. The Court is doubtful whether it has any authority, absent extraordinary and compelling circumstances, to exercise jurisdiction over the foreign affairs of the United States.[12]

Even assuming this case warrants judicial intervention and that Mexico's continuing failure to compensate plaintiffs constitutes a taking or conversion of plaintiffs' claims, plaintiffs still concede that the "highest authorities" of the Mexican Government including the President and the Legislature have failed to act. The evaluation, financing, and payment of plaintiffs' claims are not ministerial matters. *See In re Complaint of Sedco, Inc.*, 543 F.Supp. 561 (S.D. Tex.1982). *Cf. Dalehite v. United States*, 346 U.S. 15, 35–36, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953). The judgments are not merely operational, but raise substantial and serious questions of fiscal policy, and the allocation of limited resources.[13] Moreover, Professor Henkin persuasively writes, with respect to the settlement of claims by the United States, that:

> No one has successfully argued in the Supreme Court that in purporting to dispose of private claims, in the details of a particular settlement, in the procedures established for making awards to private claimants, in Congressional legislation providing (or failing to provide) for award and payment, the United States deprived the original claimants of property without due process of law, impaired the obligation of their contracts or appropriated their claims for a public purpose and was obligated to pay them just compensation for any loss. The Court has

refused to scrutinize any settlement and has affirmed that Congress has discretion to decide whether and how and to what extent to compensate the original creditors.

L. Henkin, *Foreign Affairs and the Constitution*, 263 (1972) (footnotes omitted). These considerations are high-level policy judgments, requiring deference to the expertise and discretion of the United States Congress and the Executive Branch. This Court finds it should defer under 28 U.S.C. sec. 1605(a)(5) to the expertise of the Mexican Government, regardless of whether that judgment, in the Court's or plaintiffs' views, is an abuse of discretion.

The Court is sympathetic to the plaintiffs' dilemma. The alleged delays on Mexico's part offend its sense of fair play and justice, but it must also respect its jurisdictional boundaries. Because, however, jurisdiction under the tort exception is barred with respect to all matters "based upon the exercise or performance or the failure to perform a discretionary function," the Court holds the alleged conversion of or failure to honor plaintiffs' claims extend beyond the parameters of federal subject matter jurisdiction.[14]

### B. The Act of State Doctrine

■ In reaching its decision, the Court is guided by the act of state doctrine.[15] Sovereign immunity and the act of state doctrine are generally independent concerns, and the former is binding while the latter is subject to discretionary application. *See Int'l Ass'n of Machinists & Aerospace Workers v. Org. of Petroleum Exporting*

---

**12.** *See* discussion, *infra*, at pages 1198–1200.

**13.** A few of the claims were processed by the General Claims Commission before 1941, and Mexico agreed to honor those decisions. *See* Presidential Decree, 129 D.O. sec. 5, *supra* at page 1193. Those findings, however, only went to the validity of the claims and their valuation. Even if honoring those findings is ministerial, funding them is certainly not.

**14.** An additional basis for declining jurisdiction, on which the Court does not rely, is that assuming Mexico converted plaintiffs' claims and committed a tort, the tort occurred in Mex-

ico and did not affect property in the United States. *See Perez v. The Bahamas*, 652 F.2d 186, 189 (D.C.Cir.), *cert. denied*, 454 U.S. 865, 102 S.Ct. 326, 70 L.Ed.2d 166 (1981). As noted above, the alleged tort involves the conversion of claims against Mexico, not property in the United States.

**15.** *Cf. Fountain v. Metro. Atlanta Rapid Transit Authority*, 678 F.2d 1038, 1041 (11th Cir.1982) ("federal courts should be scrupulous in confining their use of judicial power to the precise limits set by the Constitution and Congress.").

*Countries,* 649 F.2d 1354, 1359 (9th Cir.), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982) (hereinafter *"OPEC"*). The Court in *OPEC* explained:

> The doctrine of sovereign immunity is similar to the act of state doctrine in that it also represents the need to respect the sovereignty of foreign states. The two doctrines differ, however, in significant respects. The law of sovereign immunity goes to the jurisdiction of the court. The act of state doctrine is not jurisdictional. *Ricaud v. American Metal Co.,* 246 U.S. 304, 309 [38 S.Ct. 312, 313, 62 L.Ed. 733 (1920)] ... (1918). Rather, it is a prudential doctrine designed to avoid judicial action in sensitive areas. Sovereign immunity is a principle of international law, recognized in the United States by statute. It is the states themselves, as defendants, who may claim sovereign immunity. The act of state doctrine is a domestic legal principle, arising from the peculiar role of American courts. It recognizes not only the sovereignty of foreign states, but also the spheres of power of the co-equal branches of our government ... The act of state doctrine is apposite whenever the federal courts must question the legality of the sovereign acts of foreign states.

649 F.2d at 1359.[16]

Many, if not all, of the issues raised under the FSIA involve the acts or omissions of the Mexican Government, and even assuming the FSIA did not preclude jurisdiction, consideration of those issues are at best on the fringe of judicial authority.

The Supreme Court ruled in *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897) that:

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory.

*See also Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); *D'Angelo v. Petroleos Mexicanos,* 422 F.Supp. 1280 (D.Del.1976), *aff'd,* 564 F.2d 89 (3d Cir. 1977). Plaintiffs contend that the doctrine does not apply to this case because Mexico has failed to prove an act of state affecting property or persons over which Mexico is the sovereign. Plaintiffs must concede and in fact they allege that the Mexican Government has failed to act. They rely, however, on three alleged facts: (1) Mexico has not yet proven an act of state sufficient to warrant application of the doctrine at this stage of the litigation; (2) plaintiffs' claims are located in the United States and are not subject to the sovereignty of Mexico; and (3) the act of state doctrine is discretionary and is unnecessary in the case because the validity of Mexico's acts are not in issue.

In *Alfred Dunhill, supra,* the Court held that Cuba could not rely on the assertions of counsel that the failure to pay a debt was an act of state. 425 U.S. at 694–95, 96 S.Ct. at 1861. In this case, however, plaintiffs base their claim on Mexico's failure to act, which the Court assumes to be true for the purpose of this motion.[17] No further proof is required unless plaintiffs contend that the failure to act is not an act of state; an assertion which has little, if any, merit. *D'Angelo v. Petroleos Mexicanos,* 422 F.Supp. at 1290 ("Non-action as well as affirmative conduct of a governmental agency, if based upon sovereign governmental authority, can have the status of an act of state ....").

Plaintiffs' reliance on the situs of their claims is likewise misplaced. As discussed above, and as plaintiffs concede, their claims were assumed by Mexico in return for an assumption of American claims by

---

16. The court went on to hold that the FSIA could not and does not supersede the act of state doctrine. *Id.* at 1359–60.

17. The affidavit of Oscar Flores, Attorney General of Mexico, attached to Defendant's motion as Exhibit A, merely confirms the allegations in plaintiffs' Complaint and is unnecessary for the Court to reach its holding.

the United States.[18] At no time prior to the transfer did plaintiffs establish a legal right to their claims prior to Mexico's assumption.[19]

For the Court to accept plaintiffs' argument, it would first have to hold that any person who has a claim against a foreign sovereign could transfer situs of the claim to the United States by moving to the United States. Clearly, such a holding distorts the doctrine whose application does not focus as much on the situs of property, but on whether a court in ordering relief would unduly interfere with the foreign affairs authority of the executive branch. *See Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co.,* 392 F.2d 706, 715 (5th Cir.) *cert. denied,* 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed. 260 (1968); *Maltina Corp. v. Cawy Bottling Co.,* 462 F.2d 1021, 1027 (5th Cir.), *cert. denied,* 409 U.S. 1060, 93 S.Ct. 555, 34 L.Ed.2d 512 (1972). Unlike *Maltina,* Mexico is not seeking extra-territorial enforcement of an act of state (i.e., a corporate dissolution), but respect for its discretion to handle plaintiffs' claims. *Id.* at 1025–26.[20] Nor is Mexico or any other party seeking to impose the effect of Mexico's acts on property located in the United States.

Finally, plaintiffs ask the Court to use its discretion and not apply the doctrine. As noted above, however, the issues before the Court, both in determining jurisdiction and, if it had been necessary, in affording ultimate relief, would require the Court to exercise its power in zones of influence delegated by the Constitution to the executive and legislative branches.

"There is a long history of [executive] governmental action compensating our own citizens out of foreign assets in this country for wrongs done them by foreign governments abroad." *Sardino v. Federal Reserve Bank of New York,* 361 F.2d 106, 112 (2d Cir.), *cert. denied,* 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966). Frequently, they are the result of claims settlement negotiations on the sovereign to sovereign level. *See e.g., United States v. Pink,* 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942); *United States v. Belmont,* 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); *Great Western Insurance Co. v. United States,* 112 U.S. 193, 199, 5 S.Ct. 99, 102, 28 L.Ed. 687 (1884). Judicial intervention would directly interfere with the historical authority of the executive and legislative branches in negotiating, signing and ratifying treaties. For the Court to rule that Mexico violated international and Mexican law by failing to compensate plaintiffs would seriously damage the lawful and apparent authority of United States negotiators. *See, e.g., Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423, 84 S.Ct. 923, 937, 11 L.Ed.2d 804 (1964); *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936); *Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897). Entertainment of plaintiffs' claims could reopen the Mexican-American claims dispute.[21] Wherefore, the Court alternatively holds that the act of state doctrine bars consideration of plaintiffs' case.

## IV. *Conclusion*

The Court is deeply troubled by the allegations in plaintiffs' complaint. Mexico

---

**18.** *See* discussion, *supra,* at pages 1192–1193.

**19.** *Id.*

**20.** In *Maltina,* the former owners of a brewery, expropriated and dissolved by Cuba, were successful in defeating a claim that their corporate dissolution was an act of state and that their corporate authority must be honored in the United States insofar as it involved trademarks located in the United States. *Id.* at 1027.

**21.** A recent example of this possibility is the negative impact on United States relations with China as a result of *Jackson v. Peoples Republic of China,* 550 F.Supp. 869 (N.D.Ala.1982).

In *Jackson,* China chose not to appear and defend against a suit for payment on $41.3 million of 1911 Huguang railroad government obligations. The Court entered a default judgment and subsequently the Executive Branch has been requested by Chinese officials to intervene in the decision and deny its effect. Wren, *Separation of Powers? You Must Be Kidding Says China,* N.Y. Times, March 20, 1983, The Week In Review Section. Unlike this case, had the foreign sovereign entered an appearance, the Court might have been presented with a record on which to consider the act of state doctrine.

agreed in 1941 to assume responsibility for plaintiffs' loss of land in the Southwestern United States. Neither the United States nor an appropriate legal forum within its borders ever found plaintiffs' claims to be legally cognizable. Mexico received substantial consideration, however, in return for its assumption: a release from liability for various claims of American citizens resulting from the Mexican Revolution. Those latter claims were paid by the United States as part of its recognized treaty obligations.

For reasons unknown to the Court, and beyond its limited grant of jurisdiction under Article III of the Constitution, Mexico has allegedly failed, as the 1941 treaty provides, to promptly evaluate the claims and provide compensation. Despite these serious concerns, the Court holds that it lacks subject matter jurisdiction over this case pursuant to the FSIA.

### ORDER

WHEREFORE, it is this 20th day of April, 1983, hereby ORDERED that defendant's motion to dismiss the complaint be and hereby is granted.