**ASOCIACION de RECLAMANTES, et al., Appellants,**

v.

**The UNITED MEXICAN STATES.**

**No. 83–1596.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 23, 1984.

Decided June 5, 1984.

---

Vicki C. Jackson, Washington, D.C., with whom Robert J. Salazar, Russell E. Vigil, Denver, Colo., Mitchell Rogovin, George T. Frampton, Jr., Washington, D.C., and Jess J. Araujo, Santa Ana, Cal., were on the brief, for appellants.

John H. Shenefield, Washington, D.C., with whom Eric L. Richard and D. Stephen Mathias, Washington, D.C., were on the brief, for appellee.

Before EDWARDS and SCALIA, Circuit Judges, and SWYGERT,* Senior Circuit Judge for the United States Court of Appeals for the Seventh Circuit.

Opinion for the Court filed by Circuit Judge SCALIA.

Concurring statement filed by Circuit Judge HARRY T. EDWARDS.

SCALIA, Circuit Judge:

This case comes before us on appeal from an order of the District Court dismissing appellants' complaint for lack of subject matter jurisdiction pursuant to Fed.R. Civ.P. 12(b)(1). It presents the issue of interpreting the "immovable property" exception and the "tortious act" exception to sovereign immunity contained in the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1605(a)(4) & (5) (1982).

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

## I

Appellants, six individuals and the Asociacion de Reclamantes, claim[1] to be or to represent the successors in interest to recipients of 433 land grants from the King of Spain or the Republic of Mexico, covering some 12 million acres now located in the State of Texas, valued in 1925 at close to $200 million. The original grantees, Spanish and Mexican citizens, were allegedly driven from their land and divested of title by the United States and Texas in the period following the Mexican-American War. Those landowners, whose rights to title and use of their Texas land were explicitly protected by the Treaty of Guadalupe Hidalgo, Feb. 2, 1848, United States-Mexico, 9 Stat. 922, T.S. No. 207, Art. VIII, may have possessed, at that time, actionable claims against the United States for the restoration of title and possession.

The complaint does not allege that those claims were ever pursued in United States courts. Rather, in the early 1920s, a new Mexican government, headed by General Obregon, espoused the claims and asserted them against the United States in negotiations between the two sovereigns. On September 8, 1923, Mexico and the United States concluded the Treaty on General Claims, United States-Mexico, 43 Stat. 1730, T.S. No. 678, which empowered a General Claims Commission to evaluate the claims of each country's nationals raised in the negotiations. Mexico filed with the Commission all 433 land claims at issue here, but by 1936, when the authority to hear claims expired,[2] none had been evaluated.

In 1938, new disputes between Mexico and the United States arose when Mexico expropriated without compensation oil-producing property owned by American citizens. Negotiations between the two sovereigns were resumed, and the 433 land claims were again on the bargaining table.

Those negotiations culminated in the Treaty on Final Settlement of Certain Claims, United States-Mexico, 56 Stat. 1347, T.S. No. 980 (Nov. 19, 1941) (the "1941 Treaty"). By the terms of that treaty, Mexico released the United States from liability on all claims—including the 433 Texas land claims—asserted by Mexico against the United States. In addition, Mexico paid the United States a lump-sum $40 million and was absolved of liability on all claims maintained against it. Each sovereign assumed the obligation to satisfy the espoused claims of its own nationals, which the United States did within seven years. Shortly after the Treaty was signed, Mexico acknowledged its obligation by presidential decree, Decree of President Manuel Avila Camacho, Dec. 9, 1941, *published in* El Diario Oficial, Dec. 31, 1941, and assurances have been made by the Mexican government to individual appellants as recently as 1970 that compensation would be forthcoming.

Nevertheless, over forty years after the 1941 Treaty, Mexico has failed to pay a single claim. Nor has it legislated any mechanism for adjudicating or funding the claims. In this action appellants seek damages from the Mexican sovereign for its uncompensated taking of the Texas land claims. They also ask the court to place all monies paid in satisfaction of Mexico's liability into a fund, and to supervise its distribution. Appellants allege jurisdiction under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. §§ 1330, 1602–1611 (1982), which creates exceptions to sovereign immunity for actions involving rights to immovable property located within the United States and for actions for torts committed within the jurisdiction of the United States.

The District Court found jurisdiction lacking and dismissed the complaint. The

---

1. Although for purposes of a Rule 12(b)(1) motion we need not accept as true the plaintiffs' version of controverted jurisdictional facts, *Williamson v. Tucker,* 645 F.2d 404, 412–13 (5th Cir.1981), appellee has not contested the historical account proffered by appellants and set forth here.

2. The General Claims Commission heard cases until 1931. Pursuant to the General Claims Protocol of April 24, 1934, United States-Mexico, 49 Stat. 3531, E.A.S. No. 57, claims not decided by the Claims Commission were transferred to two appraisers, whose authority to evaluate the claims was to last until June 30, 1936.

District Court also held, alternatively, that the Act of State doctrine would prohibit adjudication of the merits of the complaint even if jurisdiction existed. We agree that the FSIA grants immunity to Mexico in this matter and affirm the District Court for that reason. We have no need—and, because we lack jurisdiction, no power—to reach the Act of State issue.

## II

The FSIA provides the sole basis for subject matter jurisdiction over suits against foreign states. 28 U.S.C. §§ 1330, 1604. The Act was intended to codify the so-called "restrictive" principle of sovereign immunity, under which foreign sovereigns are accorded immunity with regard to their sovereign or public acts (*actiones jure imperii*), but not with respect to their commercial acts (*actiones jure gestionis*), and in addition to withhold immunity for certain narrowly defined public acts for which local adjudication was deemed imperative (*e.g.*, traffic accidents caused by employees and officials of a foreign embassy). H.R.Rep. No. 1487, 94th Cong., 2d Sess. 7, 20–21, *reprinted in* 1976 U.S.CODE CONG. & AD.NEWS 6605, 6619–20 (hereinafter "House Report").[3] The Act sets forth as the general rule that "a foreign state shall be immune from the jurisdiction of the courts of the United States," 28 U.S.C. § 1604; and then creates exceptions to that immunity for specific categories of cases.

Appellants do not allege that Mexico's conduct in this case was commercial or private in nature. Thus, the largest and most important exception to immunity, for a foreign sovereign's commercial activities having some nexus with the United States, 28 U.S.C. § 1605(a)(2), is not at issue. Instead, appellants stake their case on two relatively minor exceptions to immunity that apply to public as well as private acts. We consider each of these in turn.

### A. The "Immovable Property" Exception—§ 1605(a)(4).

Appellants contend that their causes of action against Mexico fall within the exception to foreign sovereign immunity for "any case in which ... rights in immovable property situated in the United States are in issue." 28 U.S.C. § 1605(a)(4). Appellants do not now seek to have any land restored to them; rather, they argue that their rights to be compensated by Mexico for its taking of their prior rights (against the United States) to title and possession of the 433 tracts in Texas constitute "rights in immovable property" for purposes of this exception. The issue is one of statutory interpretation: whether Congress, in enacting the FSIA, intended the phrase "rights in immovable property" to be broad enough to encompass rights to compensation traceable historically to disputes over title to American land, which disputes have been settled by international agreement.

The District Court apparently agreed with appellants' broad reading of the exception, believing jurisdiction to exist if the suit "involves an action to quiet title *or to recover money derivative of real property rights.*" *Asociacian* [*sic*] *de Reclamantes v. The United Mexican States*, 561 F.Supp. 1190, 1196 (D.D.C.1983) (emphasis added).[4]

---

**3.** Amid the confusion of the last few days of the 94th Congress two identical foreign sovereign immunity bills were passed and presented to the President for signature. The President signed the House bill, H.R. 11315, and vetoed the Senate bill, S. 3553, for technical reasons. (The President expressed doubt that the Senate bill had been properly enrolled because the Senate, after it had passed the House bill, had attempted unsuccessfully to rescind the prior passage of its own bill. 122 CONG.REC. 35082 (1976).) For this reason, we do not cite the Senate Report which is, in any event, identical to its House counterpart.

**4.** The District Court held that even this broad reading of the immovable property exception did not cover this suit, and that the claims involved mere "intangible property rights created through the diplomatic process," because appellants had not alleged that they (or, presumably, their predecessors in interest) had title to the land in 1923, when the United States-Mexico claims negotiations took place, or that they had attempted to regain title in a legal forum prior to that time. 561 F.Supp. at 1196–97. We reject that analysis because such allegations did appear in an Exhibit to the Complaint, *see* Amended Complaint, Exhibit B, which is sufficient. Fed.R.Civ.P. 10(c); *Mountain Fuel Supply Co. v. Johnson*, 586 F.2d 1375, 1382 (10th Cir.1978), *cert. denied*, 441 U.S. 952, 99 S.Ct. 2182, 60 L.Ed.2d 1058 (1979).

Appellants support that expansive reading, arguing that the statutory language "rights in immovable property," is broad enough to accommodate their "interest" in the Texas land. They point out that the same term is elsewhere afforded a scope which they assert is expansive enough to include their compensation claims: *e.g.*, at civil law (where it includes leases, licenses, rents, mineral rights, easements, royalties and profits, LA.CIV.CODE ANN. art. 535 (West 1980)) and in the law of eminent domain (where the compensation awarded for the compulsory conversion of real estate "will be treated as real estate until the owner, being *sui juris*, accepts it as personal property," 1 G. THOMPSON, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY, § 19 at 83 (1980 Replacement) (footnote omitted)). Appellants also claim to find support for a broad interpretation in the legislative history of the FSIA: "[A] foreign state cannot deny to the local state the right to adjudicate questions of ownership, rent, servitudes, and similar matters ...." House Report, *supra*, at 20, 1976 U.S.CODE CONG. & AD.NEWS 6619.

Admittedly, the term "rights in immovable property" is an imprecise one, susceptible of as many different meanings as there are areas of law for which that characterization of an interest may be relevant. *See* 1 G. THOMPSON, *supra*, at § 19. Our job, however, is not to give the term the most expansive reading possible, nor to extract from different sources of law an artificial consensus definition of the term, but to determine what Congress meant by the language in this particular statute. Our reading of the legislative history and understanding of the purposes of the FSIA counsel a far narrower construction of the term than that advanced by appellants.

The immovable property exception was enacted to codify, with minor modifications not relevant here, the pre-existing real property exception to sovereign immunity recognized by international practice. *See* House Report, *supra*, at 20, 1976 U.S.CODE CONG. & AD.NEWS 6620, *referring to* Letter from Jack B. Tate, Acting Legal Adviser, U.S. Dept. of State, 26 Dept. of State Bulletin 984 (1952), *reprinted in Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings on H.R. 11315, Before the Subcomm. on Administrative Law and Governmental Relations of the House Comm. on the Judiciary,* 94th Cong., 2d Sess. 54–55 (1976). That practice declined to extend the immunity of a foreign sovereign to "an action to obtain possession of or establish a property interest in immovable property located in the territory of the state exercising jurisdiction." RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 68(b) (1965). *Accord,* RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW OF THE UNITED STATES (REVISED) § 455(1)(c) & comment b (Tent. Draft No. 2, 1981). Thus, a foreign sovereign was not immune in an eminent domain proceeding involving its property, but was immune in a negligence suit for injury suffered by a private individual while on its property. RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW OF THE UNITED STATES, *supra,* at § 68 comment d.

The origin of the traditional exception limited to questions involving property interests or possession is self-evident. A territorial sovereign has a primeval interest in resolving all disputes over use or right to use of real property within its own domain. As romantically expressed in an early treatise:

> A sovereignty cannot safely permit the title to its land to be determined by a foreign power. Each state has its fundamental policy as to the tenure of land; a policy wrought up in its history, familiar to its population, incorporated with its institutions, suitable to its soil.

1 F. WHARTON, CONFLICT OF LAWS § 278 at 636 (3d ed. 1905). A subsidiary concern, less instinctive and mystical, is that courts are simply not well equipped to decide property interests or rights to possession with regard to land outside their jurisdiction, particularly land located in a foreign nation. *See Reasor-Hill Corp. v. Harrison,* 220 Ark. 521, 523, 249 S.W.2d 994, 995 (1952). These considerations produced not only the exception to sovereign immunity we are here discussing, but also the "local action rule," which makes the locality's

power exclusive and deprives other courts of jurisdiction to settle questions involving real estate. *Griner v. Trevino*, 207 S.W. 947, 949–50 (Tex.Civ.App.1918); 1 G. THOMPSON, *supra*, § 4 at 24 (citing cases). The latter, like the former, is limited to questions that directly implicate interests in the property or rights to possession. *Compare, e.g., Pace v. Ott*, 189 Okla. 230, 231, 115 P.2d 253, 255 (1941) (action for damages to land sustained by oil and salt water pollution is not a local action), and *Wise v. Isenhour*, 9 N.C.App. 237, 239, 175 S.E.2d 772, 773 (1970) (action for damages against builders for breach of construction contract is not a local action), *with, e.g., Livingston v. Jefferson*, 15 F.Cas. 660 (C.C. D.Va.1811) (No. 8,411) (action for trespass is a local action), and *Wilson v. Kryger*, 29 N.D. 28, 34, 149 N.W. 721, 723–24 (1914) (action to determine adverse claims to real property is a local action). *See also* 21 C.J.S. *Courts* §§ 45–49 (1940). The two doctrines are obviously complementary, since the local action rule without the real property exception to sovereign immunity would mean that real property disputes involving foreign sovereigns could not be resolved in any court.

That § 1605(a)(4), like the traditional real property exception it was intended to codify, is limited to disputes directly implicating property interests or rights to possession is consistent with the examples of its

application mentioned in the House Report and cited by appellants: suits involving "questions of ownership, rent, servitudes," House Report, *supra*, at 20, 1976 U.S.CODE CONG. & AD.NEWS 6619.[5] It is also consistent with the single case cited by appellants interpreting § 1605(a)(4), *County Board v. Government of the German Democratic Republic*, Civil No. 78–293–A (E.D.Va. Sept. 6, 1978), *reprinted in* 17 Int'l Legal Materials 1404 (1978). In that case a county taxing authority in the United States sued a foreign sovereign for delinquent real estate taxes. An amendment to the complaint added a prayer for declaratory judgment that the property in question was subject to the state's statutory tax lien in favor of the county. On the issue of amenability to suit under § 1605(a)(4) the court held:

> Whether or not the issue of rights in immovable property is present under the original pleadings, after the amendment of pleadings being allowed below, the issue will be a specific matter for the court's attention in determining the question of the county's lien . . . .

*Id.* at 1405.

■■■ To see that appellants' claims against Mexico are not of the character involving property interests or possession to which the § 1605(a)(4) exception attaches, it is useful to review the manner in

---

**5.** It is true that an action for rent does not always call into question either ownership or possessory rights—though the remedy for nonpayment certainly does where the tenant is still in possession. The parties have not cited, and we have not found, any cases either before or after the FSIA dealing with the application of sovereign immunity to actions for rent against foreign sovereigns. However, the related local action rule has been applied to rent suits. According to Tiffany, it would apply or not apply depending upon whether the suit involved only assignees of the parties to the original lease (and was thus based only on privity of estate) or rather involved the original parties to the contract. 3 H. TIFFANY, REAL PROPERTY § 911 at 582 (3d ed. 1939). If this is in fact a general distinction, it is assuredly not one that all courts have followed. Some, for example, appear to apply the local action rule to only those rent suits in which title is in dispute. *See, e.g., Prospect Point Land Improvement Co. v. Jackson*, 109 N.J.L.

385, 387, 162 A. 576, 577 (1932); *California v. Royal Consolidated Mining Co.*, 187 Cal. 343, 351, 202 P. 133, 136–37 (1921). We need not inquire further into this fascinating issue; or into the more consequential issue of whether the FSIA was intended merely to codify the preexisting exception to sovereign immunity in rent cases (whatever the scope of that might have been), or to extend that exception to all rent cases, or perhaps (though it seems unlikely) by the mere mention of the single word "rent" in the legislative history to create an entirely new exception where none existed before. The point for present purposes is that actions for rent frequently involve issues of title and possession, and have been given distinctive jurisdictional treatment for that reason. Reference to such actions in the legislative history of the FSIA thus does not establish any departure from the traditional principle that the real estate exception to sovereign immunity is bounded by concern for those issues.

which those claims originated. Under well-established principles of international law, a sovereign possesses the absolute power to assert the private claims of its nationals against another sovereign. *See* L. HENKIN, FOREIGN AFFAIRS AND THE CONSTITUTION 262–63 (1972); RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW OF THE UNITED STATES, *supra*, at § 212. This authority to espouse claims does not depend on the consent of the private claimholder, *id.* at § 213, and the fact that a claim has been espoused provides a complete defense for the defendant sovereign in any action by the private individual, *id.* at § 205. Once it has espoused a claim, the sovereign has wide-ranging discretion in disposing of it. It may compromise it, seek to enforce it, or waive it entirely. *See Dames & Moore v. Regan,* 453 U.S. 654, 680, 101 S.Ct. 2972, 2987, 69 L.Ed. 918 (1981); Administrative Decision No. V (United States v. Germany), Mixed Claims Commission, 1924, [1923–25] Ad.Decisions and Ops. 145, 190, 7 U.N.Rep. Int'l Arb.Awards 119, 152. Final settlement between the sovereigns "wipe[s] out the underlying private debt," L. HENKIN, *supra,* at 262, and releases the defendant sovereign from all obligation except such as the settlement agreement may provide. In the present case, it may well be that Mexico, in settling or waiving the private claims, obligated itself under its own law to its nationals whose claims it had asserted. This obligation, however, differs from the legal obligation that arose from the wrongful taking (wrongful under the law of the United States or Texas or under the Treaty of Guadalupe Hidalgo) and that was settled by the 1941 Treaty, in several crucial respects: it is owed by a different sovereign and derives from the application of different law to entirely dissimilar and distinct sovereign acts.

█ Against this background it is clear that the compensation rights asserted here are not remotely "rights in immovable property" within the meaning of § 1605(a)(4). They are not property interests in real estate, such as a leasehold, easement or servitude, nor possessory rights, nor even rights to payment of money secured by an interest in land. Neither the title to, nor the use of the Texas lands can conceivably be affected by the outcome of this suit. Appellants' predecessors in interest possessed a claim to title and possession, undoubtedly a "right in immovable property" at the time. Those property claims, however, were extinguished by the 1941 Treaty. That other obligations may have arisen in connection with the Treaty does not alter the fact that questions of title, possession and even compensation as between the original disputants, the United States and appellants' predecessors in interest, ceased to exist after 1941. It is true that the issue whether appellants' predecessors in interest ever in fact held title to these lands would, presumably, be relevant to their entitlement to compensation from Mexico. But that issue is, as far as the United States is concerned, purely of historical interest, having no bearing upon present property interests or possessory rights in its territory. The principal state interest that underlies the real property exception to sovereign immunity is therefore not implicated—as is evident from the fact that the 1941 Treaty, by providing for compensation of the private claimants by Mexico, implicitly acknowledged that state's right to resolve this historical point.

Appellants rely on *Comegys v. Vasse,* 26 U.S. (1 Pet.) 193, 7 L.Ed. 108 (1828), for the proposition that "payment [of a claim] under a claims settlement treaty ... [is properly viewed as] an indemnification for the violation of a preexisting property right." Appellant's Brief at 15. That is undoubtedly so, but does not resolve the issue here: whether the right to indemnification is in the nature of a real property right for purposes of the FSIA. In *Comegys* the United States was in the position of Mexico here: It had espoused claims against Spain and settled them, producing an obligation on its part (under the terms of the settlement treaty) to indemnify the original claim-holders. The case involved a claim-holder who had made an assignment in bankruptcy *before* the United States had espoused the claim; and the issue was whether the indemnification should be paid to him or to the assignee. The Court held,

reasonably enough, that the indemnification was not a "donation or gratuity," 26 U.S. at 217, but was rather sufficiently attributable to the claim against Spain that it should go where that went—to the assignee in bankruptcy. Obviously, to say that the second claim goes to the holder of the first is not to say that it is identical with the first—either in amount or in its general character as a "real estate" claim—much less in its character as a "right in immovable property" for the specific purpose of the FSIA.[6]

In summary, while appellants may possess claims against Mexico for its uncompensated taking of previously held Texas land claims, resolution of those claims will not in any conceivable way affect property interests in, or rights to possession of, land located in the United States. Accordingly, the claims are not "rights in immovable property," within the meaning of 28 U.S.C. § 1605(a)(4).

### B. The "Tortious Act" Exception— § 1605(a)(5).

Appellants assert alternatively that jurisdiction over Mexico exists under § 1605(a)(5). That paragraph creates an exception to foreign sovereign immunity for cases

> not otherwise encompassed [by the exception for a foreign state's commercial activity], in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, *occurring in the United States and caused by the tortious act or omission of that foreign state* or of any official or employee of that foreign

state while acting within the scope of his office or employment . . . .

(Emphasis added.) Appellants claim that Mexico's failure to compensate them for its taking and use of their Texas land claims is a violation of international and domestic (presumably Mexican) law, and thus wrongful and "tortious" within the scope of § 1605(a)(5).

We need not pause to consider whether Mexico has engaged in tortious conduct under applicable law, or which law might be applicable, because it is clear that the conduct complained of lacks the required nexus with the United States.[7] Although the statutory provision is susceptible of the interpretation that only the effect of the tortious action need occur here, where Congress intended such a result elsewhere in the FSIA it said so more explicitly. *See* 28 U.S.C. § 1605(a)(2) (immunity withheld for acts "outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States"). The legislative history makes clear that for the exception of § 1605(a)(5) to apply "the tortious act or omission must occur within the jurisdiction of the United States." House Report, *supra*, at 21, 1976 U.S.CODE CONG. & AD.NEWS 6619. We have recently so held. *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 842 (D.C.Cir.1984).

It is not contended in the present case that any of Mexico's acts that could conceivably be regarded as having been committed on United States soil—the espousal, presentation and settlement of the claims— was in and of itself tortious. The grava-

---

**6.** *Comegys* also differed from the present case in that the claim had already been adjudicated by an international commission and found to be meritorious *before* it was espoused. Thus, the holding does not even establish that an espoused but unadjudicated claim such as existed here necessarily leaves *any* post-settlement rights in the original claimant. *Cf. Dames & Moore v. Regan, supra,* 453 U.S. at 688 n. 14, 101 S.Ct. at 2991 n. 14 (Court declines to decide whether U.S. citizen has a taking claim against United States when his unadjudicated private

claim is waived or settled for less than fair value).

**7.** The District Court found § 1605(a)(5) inapplicable because the Mexican conduct complained of fell within the "discretionary act" exception to the tort exception. 28 U.S.C. § 1605(a)(5)(A) ("[the tort exception] shall not apply to—(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused"). We also do not reach that issue.

men of appellants' tort claim is not these acts but the subsequent failure to compensate, an omission which must be deemed to occur in Mexico. Even if the allegedly wrongful failure to compensate had the effect of retroactively rendering the prior acts on United States soil tortious, at the very least the entire tort would not have occurred here, *see In re Sedco, Inc.,* 543 F.Supp. 561, 567 (S.D.Tex.1982) ("the tort, in whole, must occur in the United States"), and indeed we think its essential locus would remain Mexico. The primary purpose of the "tortious act or omission" exception of § 1605(a)(5) was to enable officials and employees of foreign sovereigns to be held liable for the traffic accidents which they cause in this country, whether or not in the scope of their official business. House Report, *supra,* at 20–21, 1976 U.S.CODE CONG. & AD.NEWS 6619–20. We decline to convert this into a broad exception for all alleged torts that bear some relationship to the United States.

*Affirmed.*

HARRY T. EDWARDS, Circuit Judge, concurring:

I concur in Judge Scalia's opinion for the panel, with one caveat. I want to make it clear that I read the holding of the opinion as limited by and responsive to the precise—and highly unique—case before us. In particular, I do not read the opinion to hold that, in a contemporary setting, the United States can *unlawfully* expropriate property legitimately owned by aliens in this country, consummate a treaty with a foreign sovereign extinguishing the aliens' property rights without compensation or consideration, and then totally avoid responsibility under our Constitution or other applicable laws of this Nation. We have no occasion to consider such a situation here and we express no view on its legality.