**ALLIANCE OF DESCENDANTS OF TEXAS LAND GRANTS, et al., and Blanca Rosa Villarreal Aguirre, et al., and Salome V. Adame, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 90–368L, 90–446L and 90–488L.**

United States Court of Federal Claims.

March 26, 1993.

Silvia Sepulveda–Hambor, U.S. Dept. of Justice, Land & Natural Resources Div., Gen. Litigation Section, Washington, DC, for U.S.

John J. Pichinson, Corpus Christi, TX, for Blanca Rosa Villarreal Aguirre.

Willard G. Holgate, Corpus Christi, TX, for Salome V. Adame, et al.

Max E. Wilson, Mountain City, TN, E. Cooper Brown, Takoma Park, MD, for Alliance of Descendants of Texas Land Grants, et al.

## ORDER

LYDON, Senior Judge:

Plaintiffs, heirs and successors in interest to the recipients of 433 land grants from Spain and Mexico in the nineteenth century, have sued in this court seeking compensation from the United States for taking approximately twelve million acres of land in southern Texas. Plaintiffs' complaints allege a taking without just compensation and breach of an implied contract. Defendant has pleaded a number of affirmative defenses. The case is before the court on cross-motions for summary judgment and the parties have stipulated to the relevant facts and legal documents. Having considered the parties' submissions and having heard oral argument, the court grants defendant's motion for summary judgment because plaintiff's claims are barred by the applicable statute of limitations.

## FACTS

Texas declared her independence from Mexico in 1836. Texas was recognized as a Republic by the United States in 1837 and by France, Holland, and Belgium shortly thereafter. The United States annexed Texas by a Congressional joint resolution issued on March 1, 1845, and admitted the new state into the Union on an equal footing with the original states on December 29, 1845.

The plaintiffs in this case are the heirs and descendants of Mexican nationals who, prior to 1836, had received 433 land grants from Spain or Mexico. The land grants at issue totalled approximately twelve million acres, most of which lie in the southern part of Texas below the Nueces River.

At the end of the Mexican–American war in 1848, fought largely over the disputed border between the two nations, the United States and Mexico entered into the Treaty of Peace, Friendship, Limits and Settlement, Feb. 2, 1848, 9 Stat. 922 (hereinafter Treaty of Guadalupe Hidalgo). The treaty ended the border dispute. Plaintiffs claim that after this treaty was ratified, the rights of the original grantees to the Texas lands were "wrongfully taken" by the United States. It may well be that those original land grant owners, whose rights to title and use of their Texas lands were explicitly protected by the Treaty of Guadalupe Hidalgo, may have possessed at that time actionable claims against the United States for the restoration of title and possession of the lands. There is no evidence that any such claims were ever pursued in United States courts until the 1980s. *See Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1519 (D.C.Cir.1984).

The claims to the land by the heirs and descendants of the original grantees persisted into the 1920s. Mexican citizens stated claims to lands in Texas, and American citizens stated claims to lands in Mexico. In recognition of the continuing disputes, Mexico and the United States entered into the Treaty on General Claims, September 8, 1923, 43 Stat. 1730. To provide "for the amicable settlement and adjustment of claims by the citizens of each country against the other," the Treaty provided for the creation of a General Claims Commission (composed of a representative of each nation and a representative from a third neutral country) to resolve disputes. Mexico filed 836 claims against the United States with the General Claims Commission, including the filing in 1932 of approximately 435 claims for land in Texas which had originally been granted by Spain or Mexico before 1836. At the time, the total value of the claims submitted approached two hundred million dollars. The United

States had filed 2,781 claims against Mexico as of 1940.

The General Claims Commission resolved none of the land claims submitted by the Mexican government in 1932. In early 1940 Mexico and the United States commenced negotiations aimed at resolving pending disputes between them, including the land claims and more recent claims filed by the United States for the expropriation by Mexico in 1938 of oil-producing properties that at the time had been owned by American citizens. The result of these negotiations was the Treaty on Final Settlement of Certain Claims, Nov. 19, 1941, 56 Stat. 1347 (hereinafter 1941 Treaty). As indicated above, Mexican citizens stated claims on lands in Texas (the land grant claims here in issue) and American citizens stated, *inter alia,* claims to lands in Mexico. Under the 1941 Treaty, Mexico released the United States from any and all liability as to the 435 land grant claims that Mexico had filed with the General Claims Commission in 1932. Because the value of the claims from which Mexico released the United States in full was less than the value of the claims from which the United States released Mexico, Mexico was obligated, under the 1941 Treaty, to pay the United States the sum of forty million dollars. By 1948, Mexico had timely paid this sum to the United States. Under Article III of the 1941 Treaty, the United States and Mexico "reciprocally cancel, renounce, and hereby declare satisfied all claims, of whatsoever nature, of nationals of each country against the Government of the other, which arose prior to the date of the signing of this Convention, whether or not filed, formulated or presented, formally or informally to either of the two Governments...." It seems clear that the 1941 Treaty effectively extinguished the land grant claims here in issue. *See Asociacion de Reclamantes v. United Mexican States,* 735 F.2d at 1523. Plaintiffs apparently do not disagree with this conclusion but contend that other obligations arose in connection with the 1941 Treaty which serve to support their view that they have Fifth Amendment taking claims.

Pursuant to the 1941 agreement, the president of Mexico, Manuel Avila Camacho, issued a decree acknowledging Mexico's obligation to pay compensation for the 435 disputed land grant claims, stating that these claims had become a "domestic pecuniary responsibility." Soon thereafter, some of the individuals who alleged they were heirs of the original land grantees attempted to secure compensation from the Mexican government. Plaintiffs have submitted correspondence documenting individuals' attempts to secure payment and the U.S. Department of State's instructions to them that pursuant to the treaty and the presidential decree, it had become the responsibility of the Mexican government to satisfy any claims. A 1955 letter from the Mexican Secretariat of Finance and Public Credit to a potential claimant stated that the Mexican government intended to "resolve" the land grant claims as soon as "the economic conditions of the Treasury" would permit it to.

Individuals petitioned the Mexican government for redress for a number of years. In the late 1970s, individuals claiming to be heirs of the original Texas land grantees formed the Asociacion de Reclamantes (not a party to this case) with the objective of securing compensation from Mexico. In October 1976, a representative of the Mexican Foreign Ministry told Asociacion de Reclamantes it would pay the claims of those individuals who could prove they were legal heirs of the original grantees. Relying on this representation, some individuals submitted the appropriate documentation to the Mexican government, but received no response.

After further meetings with representatives of the Mexican government, in January 1980 representatives of the Mexican Treasury Department told potential claimants that the legislation to establish the mechanisms to pay the land grant related claims would be drafted and ready for submission to the Mexican Congress in September 1980. By a January 1980 letter the Mexican Secretariat of Public Finance and Credit notified the attorney representing Asociacion de Reclamantes that as long as an appropriations law in this matter re-

mained unpromulgated, "it would not be possible for this branch to review or discuss any specific proposal relating to the indicated claims, since it would lack the authority to do so."

Under the 1941 Treaty, each country assumed the obligation to satisfy all the claims of its own nationals. The United States satisfied the claims of its nationals against Mexico within seven years. *Asociacion de Reclamantes v. United Mexican States*, 735 F.2d at 1519. In the fifty years since the 1941 Treaty, Mexico has failed to satisfy the claims of the heirs of the original grantees. Mexico has failed to pay on any of these claims, and it has not legislated any mechanism for adjudicating or funding any of them.[1]

Asociacion de Reclamantes and others filed a class action against the United Mexican States in the United States District Court for the District of Columbia on September 18, 1981, seeking damages from Mexico for its uncompensated taking of the Texas land grant claims. The court dismissed the case for lack of subject matter jurisdiction as the claims were barred by the Foreign Sovereign Immunities Act, 28 U.S.C. § 1604, and the act of state doctrine. *Asociacion de Reclamantes v. United Mexican States*, 561 F.Supp. 1190 (D.D.C. 1983).[2] The Court of Appeals for the District of Columbia Circuit affirmed on the basis that jurisdiction was lacking, 735 F.2d 1517 (D.C.Cir.1984).

The litigation in this court was generated by the filing of three complaints. The Alliance of Descendants of Texas Land Grants (Alliance), an association of 686 persons, filed Docket No. 90–368L on April 27, 1990. Blanca Rosa Villarreal Aguirre and 199 other plaintiffs filed docket No. 90–446L on May 24, 1990. Salome Adame and 109 other plaintiffs filed Docket No. 90–488L on June 5, 1990. On June 27, 1990, the court granted defendant's motion to defer ruling on Alliance's motion for class certification. The cases were consolidated on or about September 27, 1990. Plaintiffs are seeking $1,364,000,000.00 in damages.[3]

Plaintiffs have moved for summary judgment on the issue of liability and for partial summary judgment on the issue of damages. Defendant filed a motion to dismiss or, in the alternative, for summary judgment. In support of its motion, defendant has pleaded as affirmative defenses, among others, that this court lacks subject matter jurisdiction because the claims are based on an international treaty, that plaintiffs have failed to make out a claim of either a taking or breach of an implied contract, that the claims present nonjusticiable political questions, and that all of plaintiffs' claims are barred by the statute of limitations. The court agrees with the government that all the claims presented by plaintiffs are barred by the statute of limitations. Accordingly, extended discussion of the merits of plaintiffs' complaints and the other affirmative defenses is un-

---

1. Plaintiffs argue it would be inequitable not to pay them for the taking of the lands of their ancestors more than 150 years ago. It would appear, however, just as inequitable for the United States to be required to pay for a taking of lands that Mexico says is its "domestic pecuniary responsibility," ignoring the fact that the United States paid its citizens for lands owned by United States citizens that were taken by Mexico.

2. Mexico also raised the statute of limitations as a defense, but the court did not reach that issue because of a lack of subject matter jurisdiction, 561 F.Supp. at 1194 n. 4.

3. The complaints filed by Alliance and Adame each sought at least $1,364,000,000.00 in damages. The complaint filed by Villarreal Aguirre stated no specific damage figure, but instead appended an exhibit listing groups of individual

plaintiffs and the compensation each group was seeking. For the purposes of the consolidated complaints and resolving the cross-motions for summary judgment before the court, the court shall treat the consolidated complaints as together seeking an aggregate of $1,364,000,000.00 in damages. In this regard, the court notes that "plaintiff's view would impose on the United States a very large financial burden. In a case coming from this court, the Supreme Court cautioned against reading a statute to impose liability on the Federal Government, where 'the liability would mount to great sums', unless the words (or intent) are plain." *Schellfeffer v. United States*, 170 Ct.Cl. 178, 187, 343 F.2d 936, 942 (1965) (quoting *Pine Hill Coal Co. v. United States*, 259 U.S. 191, 196, 42 S.Ct. 482, 483, 66 L.Ed. 894 (1922)) (footnote omitted).

necessary.[4] *Kabua v. United States*, 212 Ct.Cl. 160, 162, 546 F.2d 381, 382 (1976); *Steel Improvement & Forge Co. v. United States*, 174 Ct.Cl. 24, 28, 355 F.2d 627, 630 (1966).

## DISCUSSION

In order for the Court of Federal Claims to entertain a plaintiff's claim, the plaintiff must sue in this court within six years after the claim first accrues. 28 U.S.C. § 2501. Failure to comply with this six-year statute of limitations is jurisdictional, and places the claim beyond the court's power to hear and decide. *Jones v. United States*, 801 F.2d 1334, 1335 (Fed. Cir.1986), *cert. denied*, 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 495 (1987). This court's jurisdiction "is always strictly construed because it depends on the consent of the sovereign to be sued, and is not to be extended by implication." *Kabua v. United States*, 212 Ct.Cl. 160, 167, 546 F.2d 381, 385 (1976). Strict construction of this jurisdictional requirement also better advances a primary objective of statutes of limitations, namely, "to prevent factual issues from being tried too long after the events occurred—with witnesses dead or gone, records lost or destroyed, and memories confused or dimmed—at a time when the past cannot be reconstructed with any pretense of accuracy." *Camacho v. United States*, 204 Ct.Cl. 248, 260, 494 F.2d 1363, 1370 (1974). *See also Lunaas v. United States*, 936 F.2d 1277, 1279 (Fed.Cir.1991) (action for repayment of loan that became due in 1781 was time-barred).

A claim first accrues when all the events have occurred which fix the alleged liability of the government and entitle the plaintiff to institute an action. *Japanese War Notes Claimants Ass'n, Inc. v. United States*, 178 Ct.Cl. 630, 632, 373 F.2d 356, 358, *cert. denied*, 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967). For the statute of limitations to be satisfied, plaintiff must identify an event that directly affects the rights asserted in its suit that took place within six years prior to filing a complaint in this court. *See id.* The third group of plaintiffs filed in this court on June 5, 1990. Therefore, for the purposes of this motion, the consolidated plaintiffs must identify an event affecting their legal rights that occurred after June 5, 1984.

Plaintiffs have not discharged their burden of identifying a post-June 5, 1984 event that would allow them to satisfy the statute of limitations. They propose in their complaints that the land grantees were divested of title to some twelve million acres without the payment of just compensation. This divestiture, which plaintiffs argue is a taking, could have "occurred" as early as the signing of the Guadalupe Hidalgo Treaty in 1848. At the latest, the alleged taking occurred with the signature of the Treaty on Final Settlement of Certain Claims in 1941, in which the United States settled its claims its Mexico and left the heirs of the original grantees with the possibility of obtaining redress from the Mexican government. It is axiomatic that a cause of action for an unconstitutional taking accrues at the time the taking occurs. *Steel Improvement & Forge Co. v. United States*, 174 Ct.Cl. 24, 29–30, 355 F.2d 627, 631 (1966). Additionally, assuming that plaintiffs can make out a cause of action based on an implied contract that arose at the end of the Mexican–American War when American officials dealt directly with the plaintiffs' ancestors and promised to protect their rights, the claim would be barred because it would have accrued at

---

4. Among other arguments, the government urges that plaintiffs have failed to establish a taking claim in that they at no point demonstrate that a particular action of the United States deprived a grantee of a particular parcel of land. The court does not need to reach this issue, but notes it is inclined to agree with the government. Although it may seem obvious, "[i]n order to state a claim for a taking under the fifth amendment's just compensation clause, the plaintiff must establish that it was the owner of property and that such property was taken by the United States for a public purpose." *Shanghai Power Co. v. United States*, 4 Cl.Ct. 237, 239–40 (1983). The relatively unadorned assertion that the original grantees were "driven from their lands" and divested of title after the Mexican–American War does not satisfy this primary element. Whatever property claims the grantees may have had at one time, "[they] were extinguished by the 1941 Treaty." *Asociacion de Reclamantes*, 735 F.2d at 1523.

the time the original land grantees completely performed its part of the implied bargain. *Id.* at 29, 355 F.2d at 631. An implied contract claim would have accrued when plaintiffs' ancestors agreed to lay down their arms and observe the Guadalupe Hidalgo Treaty.

■ The statute of limitations, however, can be tolled in proper circumstances, even in suits against the government. *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed.Cir.1988). The Court of Appeals for the Federal Circuit has held that a cause of action first accrues when "all the events which fix the government's liability have occurred *and* the plaintiff was or should have been aware of their existence." *Id.* To toll the statute of limitations, a claimant must demonstrate his "ignorance" of the claim by either "show[ing] that defendant has concealed its acts with the result that plaintiff was unaware of their existence or [showing] that its injury was 'inherently unknowable' at the accrual date." *Japanese War Notes Claimants Ass'n, Inc.*, 178 Ct.Cl. at 634, 373 F.2d at 359. Plaintiffs do not contend that the U.S. government has fraudulently concealed acts that would have allowed plaintiffs to know of their claims prior to June 5, 1984. But regarding the question of whether the claims were "inherently unknowable" before 1984, plaintiffs uncork an interesting argument that will be cautiously evaluated.

■ In effect, plaintiffs argue that the 1941 treaty had the ultimate effect of making their potential claims unknowable and thus incapable of being prosecuted. Their argument can be separated into four parts. First, plaintiffs argue that through the 1941 treaty, the United States effectively created an alternative remedy, *viz.*, seeking compensation from the Mexican government. This remedy was supposedly exhausted in 1985, when the Court of Appeals upheld denial of the relief sought in *Asociacion de Reclamantes.* The terms of the treaty, however, do not indicate that the U.S. established an "alternative remedy" for the plaintiffs to pursue. The amount of claims sought by the United States exceeded the amount of claims sought by Mexico by forty million dollars; this sum was paid by Mexico to the U.S. "in full settlement, liquidation, and satisfaction of the [disputed] claims." Shortly thereafter Mexican President Manuel Avila Camacho decreed that "the claims referred to [in the 1941 treaty] have lost their international character, and have become internal obligations of our government and ... [is] only one of our many domestic pecuniary responsibilities." Nowhere in the treaty does the United States establish that it would compensate plaintiffs if Mexico failed to. The treaty settled the balance of outstanding claims between the two countries—if any "alternative remedy" was established it was not by the U.S. but by President Avila's decree.[5]

■ Assuming, however, for the sake of argument, that the Treaty did establish an alternative remedy, the statute of limitations was not tolled while plaintiffs "exhausted" the other remedies available to it.

**5.** To the extent that any of plaintiffs' claims arise out of the 1941 treaty, this court has no subject matter jurisdiction over them because of the prohibition in 28 U.S.C. § 1502. At oral argument and in its most recent submission, however, plaintiffs insisted their right to compensation arises from the Fifth Amendment alone. Filing a taking claim is the other "alternative" plaintiffs (supposedly) had, but this presents problems in light of § 1502. For the court to have jurisdiction over such a claim, the claim must be able to conceivably exist independently of, or separate and apart from, the claim deriving its existence so exclusively and substantially from certain express terms or provisions thereof that the consideration of the claim would necessitate construction of the treaty itself. *Hughes Aircraft Co. v. United States*, 209 Ct.Cl. 446, 468, 534 F.2d 889, 903 (1976). In this matter, Mexico assumed these claims as internal obligations pursuant to the treaty, which plaintiffs pursued as their first "alternative." It is true that the *remedy* of plaintiffs' other alternative (just compensation for the taking) is provided by the Fifth Amendment, but, as the court has already discussed, plaintiffs must first show they had a *right*, namely, enforceable property rights. This they cannot do, a determination that was made by the court after examining the treaty, which in turn creates difficulties for plaintiffs in seeking any relief in this court, even if their claims are not time-barred.

The court cannot say that pursuing such a remedy would be a prerequisite to seeking redress from the United States. The remedy would be permissive, and the pursuit of permissive administrative remedies does not toll the six-year statute of limitations. *See Lins v. United States,* 231 Ct.Cl. 579, 584, 688 F.2d 784, 787 (1982); *Camacho v. United States,* 204 Ct.Cl. 248, 259, 494 F.2d 1363, 1369 (1974) (*citing Soriano v. United States,* 352 U.S. 270, 273, 77 S.Ct. 269, 271, 1 L.Ed.2d 306 (1957)). Additionally, the court notes that where plaintiffs have a completely accrued cause of action for monetary relief, the pendency of litigation in United States District Court does not toll the statute of limitations, *Shermco Indus., Inc. v. United States,* 6 Cl.Ct. 588, 593 (1984), nor is the statute tolled by settlement negotiations between claimants and another party who is not the United States. *Kabua v. United States,* 212 Ct.Cl. 160, 166, 546 F.2d 381, 384 (1976).

■ Second, plaintiffs claim that the 1941 treaty suspended any claims it had against the United States, and thus they had to wait until "the fact of the taking was not in controversy" before the claims became inherently knowable. The implication is that a taking on these facts could not possibly be determined until the Court of Appeals affirmed the decision in *Asociacion de Reclamantes.* This argument is specious. The cases cited by plaintiff for

this argument do hold that a taking might be questionable until the extent of the condemnation is known.[6] *See United States v. Dickinson,* 331 U.S. 745, 748, 67 S.Ct. 1382, 1384, 91 L.Ed. 1789 (1947) (taking can occur when owner's use of property is curtailed to an extent that a servitude has over the course of time been acquired); *Peter v. United States,* 6 Cl.Ct. 768, 775 (1984) (continued nuclear testing prevented cause of action from accruing). The cases before the court are clearly distinguishable from these cited cases on the facts pleaded in plaintiffs' complaints.

Third, plaintiffs suggest that the U.S. Department of State's referral of claimants to Mexico for relief "effectively suspended the statute of limitations." For representations by the United States to toll the statute of limitations, there must be a misrepresentation and concealment by the government. *Nitol v. United States,* 7 Cl.Ct. 405, 414 (1985). Plaintiffs do not allege in their complaints that the U.S. concealed or misrepresented anything; their submissions suggest that the State Department repeatedly told claimants that it had no legal obligation to them and that compensation would be paid, if it all, by the Mexican government. The U.S. government engaged in no misrepresentations, but instead advised claimants of its position as allowed by the 1941 treaty, of which plaintiffs aver they had knowledge in the early 1940s.[7]

6. On a related note, plaintiffs argue that the "disappearance" of the prospect of obtaining relief from Mexico allowed the final element of the taking claim to be alleged, *viz.,* the lack of "reasonable, certain and adequate provision for obtaining compensation" for the extinguishment of the claims. *Blanchette v. Connecticut Gen. Ins. Corp.,* 419 U.S. 102, 124–25, 95 S.Ct. 335, 349, 42 L.Ed.2d 320 (1974) (*quoting Cherokee Nation v. Southern Kansas R.R. Co.,* 135 U.S. 641, 659, 10 S.Ct. 965, 971, 34 L.Ed. 295 (1890)). The court does not read these cases as establishing that a taking cannot be alleged until the prospects for compensation are known to a metaphysical certainty to be nil. In any event, *Cherokee Nation* stated only that a landowner who had been deprived of his property had the right to assurances that there were reasonable, certain, and adequate means to secure just compensation. That there was an unconstitutional taking *had already* been established. In *Blanchette* the Court obliged itself to determine whether there was a legitimate taking allega-

tion, otherwise the plaintiffs would be wholly and peremptorily dispossessed of the opportunity to secure just compensation. The threshold jurisdictional issue was being considered by the court, not the sufficiency of the complaint.

7. Plaintiffs urge the court to recognize that its claims arise out of the Fifth Amendment's mandate of just compensation paid for a taking instead of arising from the 1941 treaty, arguing that the government has inappropriately approached plaintiffs' claims as if they should be characterized as a "treaty" claim. As noted in the foregoing discussion, the court is obviously willing to view plaintiffs' complaints as ones seeking just compensation, and precisely because these cases are considered, for present purposes, as taking claims the suits must be brought to the court within the appropriate statutory period. Plaintiffs press the court to examine *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), in which the Supreme Court held that President Carter had

Fourth, plaintiffs contend that the 1941 treaty obligated the United States to guarantee that the land claims would eventually be compensated, by either Mexico or the U.S. They argue that as of 1985, when it became dispositively apparent that they could not obtain satisfaction from Mexico, the U.S. has been breaking an implied contract. But as the court has noted, a cause of action for breach of an implied contract would have accrued in 1941 when the United States settled its claims with Mexico and began to refer claimants to Mexico City to seek relief. To put it another way, by analogy: these cases feature a creditor who faces two potential debtors, A and M. By contract, A and M agree that any obligations of A and M to the creditor will be borne by M alone. When the creditor asks A to pay, A tells the creditor that M is to pay, assures the creditor that M will pay, and tells the creditor to give M a call. Any breach of agreement between the creditor and A arose no later than the point at which A told the creditor to give M a call instead. To allow the creditor to sue A on the obligation after forty years of trying to convince M to pay would be unfair to A. No matter what A told the creditor, the creditor was aware that A (accepting for present purposes plaintiffs' alternative remedy scenario) might have had to pay, and A's truthful representations concerning the contract between A and M should not toll the applicable statute of limitations. Moreover, in this case the treaty between A and M was notice to the world that M

executive authority, pursuant to statute, to nullify attachments on Iranian assets and to transfer frozen Iranian assets back to Iran. Further, the Court reaffirmed that the President had the power to settle claims against foreign governments to resolve international disputes. What *Dames & Moore* did *not* decide is whether the President's order effected a taking that demanded just compensation. [It should be stressed that *Dames & Moore* declined to decide whether a taking had been effected by an *executive order;* not, as in this case, a treaty. The 1941 treaty was a final settlement between the United States and Mexico of the land-related claims, and a "[f]inal settlement between the sovereigns 'wipe[s] out the underlying private debt.'" *Asociacion de Reclamantes,* 735 F.2d at 1523 (*quoting* L. Henkin, *Foreign Affairs and the Constitution* 262 (1972)). A treaty is essentially a contract between two sovereigns, and like contracts, the intent of the parties making a treaty should be respected by courts.

> Since the content of treaties is so closely intertwined with political and international affairs, courts should be hesitant to interfere in any way with the wording or intent of a treaty. Only in cases where the Chief Executive has clearly violated a provision of the Constitution and denied a citizen of *this* country his full rights should a court seek to interfere with the treaty making power of the President.

*Aris Gloves, Inc. v. United States,* 190 Ct.Cl. 367, 378, 420 F.2d 1386, 1393 (1970) (emphasis added) ]. In *Dames & Moore* the Court found that such a claim could be brought in the Court of Federal Claims under the Tucker Act, but expressly refused to say whether there had been a taking: the case was heard on an emergency, expedited schedule, and the character of the taking simply could not be determined at the time. In plaintiffs' case, however, the court finds that the character of the taking could have

determined no later than the 1940s. Plaintiffs contend they could not have brought an action in the Court of Claims at that point because "there appeared in 1942 to be a realistic prospect of obtaining payment from the Mexican government," and that *Dames & Moore* requires exhaustion of any alternative remedies before resorting to the Court of Federal Claims. The court cannot agree with the proposition that waiting forty years for the Mexican government to pay was a prerequisite to action in this court, and in any event finds no authority in *Dames & Moore* for the contention that to file in this court it must first be determined that all other remedies (especially permissive ones) are hopeless.

"In short," plaintiffs say, the court must face "the question left open in *Dames & Moore:* whether the extinguishment of claims by operation of law, following upon a settlement of those claims on an international plane, can leave Plaintiffs without any compensation whatsoever for the loss of its property." Facing this question, however, is a thing the court cannot do, in light of a lack of subject matter jurisdiction. Instead of expanding on *Dames & Moore,* the court will be satisfied to follow it. The Supreme Court has held that there is no jurisdictional objection to actions of this sort in the Court of [Federal] Claims under the Tucker Act. The court will hold any plaintiff to the six-year statute of limitations governing actions brought under the Tucker Act in the absence of showing cause why the statute should be tolled, which the plaintiffs in this particular litigation have failed to do. *See Lunaas v. United States,* 936 F.2d 1277, 1279 (Fed.Cir.1991) (*quoting Block v. North Dakota,* 461 U.S. 273, 292, 103 S.Ct. 1811, 1822, 75 L.Ed.2d 840 (1983)) ("A constitutional claim can become time-barred just as any other claim can. Nothing in the constitution requires otherwise").

would pay. Particularly in this court, the applicable statute of limitations is jurisdictional and must be strictly construed to avoid the prosecution of stale claims. *Schmidt v. United States,* 3 Cl.Ct. 190, 192 (1983).

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment as to liability is granted, and plaintiff's motion for summary judgment as to liability is denied. Plaintiffs' motion for partial summary judgment on the issue of damages is also denied. Accordingly, Alliance's motion for class action certification is denied. The Clerk is directed to dismiss the complaints in Docket Nos. 90–368L, 90–446L, and 90–488L. No costs.